774

ESTATE OF LEVI T. SCOFIELD, DOUGLAS F. SCHOFIELD, TRUSTEE, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 38302–38309.    Filed January 18, 1956.

[1] Proceedings of the following petitioners are consolidated herewith :

| Petitioners | Docket Nos. |
|---|---|
| Estate of Levi T. Scofield, Douglas F. Schofield, Trustee | 38302 |
| Mary Jane Scofield Demmon (nee Mary Jane Scofield) | 38303 |
| Roy C. Demmon and Mary Scofield Demmon | 38304 |
| Josephine Schofield Thompson | 38305 |
| Edward W. Thompson and Josephine S. Thompson | 38306 |
| Douglas F. Schofield Trust, Douglas F. Schofield, Trustee | 38307 |
| Douglas F. Schofield and Mary D. Schofield | 38308 |
| Schofield Building Land Trust, Douglas F. Schofield, Trustee | 38309 |

*Robert F. Lee, Esq.*, and *Philip J. Wolf, Esq.*, for the petitioners.
*James F. Kennedy, Jr., Esq.*, for the respondent.

RICE, *Judge:* These consolidated proceedings involve deficiencies in income tax determined by the respondent under the provisions of the 1939 Code and refunds claimed by the petitioners as follows:

| Petitioner | Docket No. | Year | Deficiency | Claimed refund |
|---|---|---|---|---|
| Estate of Levi T. Scofield, Douglas F. Schofield, Trustee. | 38302 | 1946 | $16,903.49 | $16,903.49 |
| | | 1947 | 49,102.93 | 49,102.93 |
| | | Jan. 1, 1948 to June 30, 1948. | 3,938.39 | |
| Mary Jane Scofield Demmon (nee Mary Jane Scofield). | 38303 | 1946 | $266.00 | $1,061.78 |
| Roy C. Demmon and Mary Scofield Demmon | 38304 | 1948 | $6,384.10 | $6,123.96 |
| Josephine Schofield Thompson | 38305 | 1947 | $2,255.76 | $2,130.00 |
| Edward W. Thompson and Josephine S. Thompson. | 38306 | 1948 | $2,990.08 | $2,209.56 |
| Douglas F. Schofield Trust, Douglas F. Schofield, Trustee. | 38307 | 1948 | $2,314.46 | $1,382.24 |
| Douglas F. Schofield and Mary D. Schofield | 38308 | 1946 | $13,083.32 | |
| | | 1947 | 9,074.02 | |
| | | 1948 | 9,691.80 | |
| Schofield Building Land Trust, Douglas F. Schofield, Trustee. | 38309 | July 1, 1948 to Dec. 31, 1948. | $24,586.38 | |

The issues to be decided are: (1) Whether the deficiency notice in Docket No. 38302 for the period January 1 to June 30, 1948, is a valid deficiency notice for the year 1948; (2) whether the testamentary trust in Docket No. 38302 sustained a net operating loss in 1948, because of diversions of its funds, which can be carried back to 1946 and 1947; (3) if so, were distributions to the beneficiaries of such trust in 1946, 1947, and 1948 distributions of corpus rather than distributions of

income as originally reported; (4) whether a recovery by the testamentary trust of $10,000 in 1948, which represented a diversion of trust funds in that amount in 1932, constituted taxable income or a return of capital; (5) whether the petitioners in Docket No. 38308 are entitled to report trustee fees received by Douglas F. Schofield in 1946, 1947, and 1948 under the provisions of section 107 (d) of the 1939 Code; (6) if so, are such petitioners entitled to deduct from the fees so reported the amounts paid to Josephine Schofield Thompson in the years when payments were made to her; and (7) whether the petitioner in Docket No. 38309 is an association taxable as a corporation for the taxable period July 1, 1948, to December 31, 1948.

Concessions have been made with respect to other issues which will be taken into account under Rule 50 computations.

Some of the facts were stipulated.

GENERAL FINDINGS OF FACT.

The stipulated facts are so found and are incorporated herein by this reference.

All of the petitioners except those in Docket No. 38304 were residents of Cleveland, Ohio, during the years in issue and filed their returns with the collector of internal revenue in that city. Roy C. Demmon and Mary Scofield Demmon, the petitioners in Docket No. 38304, were residents of the State of Illinois during the year 1948. Such docket was consolidated with those of the other petitioners in this proceeding.

*Issues 1, 2, 3, and 4.*

FINDINGS OF FACT.

Levi T. Scofield built the Schofield Building in the city of Cleveland in 1901 and 1902. He died on February 25, 1917. He was survived by two sons, William M. Scofield and Sherman W. Scofield; a daughter, Harriet E. Scofield Bushnell; and two grandchildren, Douglas F. Schofield and Josephine Schofield Thompson, who were the children of his son Douglas, who died in 1912. Douglas' widow married William M. Scofield in 1916. Of that marriage, a daughter, Mary Jane Scofield, was born after Levi T. Scofield's death.

The principal asset of Levi T. Scofield's estate was the Schofield Building which he left in trust for his children and grandchildren. His will provided that William was to be the trustee of the trust and that each of his three surviving children was to be one-fourth beneficiary of the trust income and that each of his two grandchildren and the widow of Douglas were to be one-twelfth beneficiaries of such trust income. The trust corpus was to vest in his children and grand-

children on September 14, 1942, when Josephine Schofield, his youngest grandchild at the time of his death, attained the age of 30.

Levi T. Scofield's will was duly admitted to probate. His son, William, was appointed executor, filed his final account as such on March 8, 1918, and was discharged as executor on April 1 of that year. William did not file an application for appointment as trustee of the testamentary trust until March 15, 1926, on which day the Probate Court of Cuyahoga County entered an order appointing him trustee of such trust to serve without bond. William, in fact, served as trustee from the time of Levi T. Scofield's death until April 22, 1935, when his resignation as testamentary trustee was filed with and accepted by the Probate Court. Sherman W. Scofield had acted as manager of the Schofield Building prior to his father's death and continued to act in that capacity until 1932. From May 1, 1928, until September 12, 1935, Carlton Schultz, Inc., acted as the real operating manager of the building.

Levi T. Scofield opened a bank account for the Schofield Building with the Cleveland Trust Company (hereinafter referred to as the bank) on May 3, 1909. Checks on such account were signed by Sherman and countersigned by his father. On January 29, 1917, Levi T. Scofield executed a power of attorney to his son William, authorizing him to sign checks on such account during his illness. After Levi T. Scofield's death, the bank was furnished with a copy of his will, and, on March 2, 1917, the bank was advised by Sherman and William that checks on the Schofield Building account in the future would be signed by either or both of them. The account with the Cleveland Trust Company was the only account maintained by William and Sherman for trust funds, and all deposits or disbursements of such funds by them were made in and from such account.

From June 2, 1928, until September 1935, all rents from the Schofield Building collected by Carlton Schultz, Inc., were deposited by it in two checking accounts which it opened with the bank. Signature cards authorizing Carlton Schultz, Inc., or its employees to withdraw funds from such accounts were filed with the bank.

At the time of Levi T. Scofield's death, the Northwestern Mutual Life Insurance Company (hereinafter referred to as Northwestern) held a mortgage on the Schofield Building in the amount of $504,000. Late in 1934, Douglas F. Schofield was asked to approve the testamentary trust's application for an additional mortgage loan from Northwestern for the purpose of installing new elevators in the building. Douglas had graduated from law school that year and had been admitted to practice before the Ohio bar. His investigation as to the need for an additional mortgage loan led to his discovery that large amounts of trust income had been used by his uncles for non-trust

purposes. He discovered that during the period from 1917 to 1932 a total of $453,939.10 of testamentary trust funds had been disbursed by William and Sherman for non-trust purposes as follows:

(a) $134,001.26 was used from 1921 to 1932 to operate the Self-Clasp Envelope Company, most of whose stock William and Sherman owned personally.

(b) $150,933.83 was used from 1917 to 1932 for the personal use and benefit of Sherman Scofield of which $65,564 was deposited in his personal checking account at the Cleveland Trust Company, frequently to cure his overdrafts. The balance consisted either of checks drawn to pay his personal bills or of checks which he cashed and the proceeds of which he spent for personal uses.

(c) $75,808.89 was used from 1917 to 1931 to finance and develop a real estate allotment in which William and Sherman Scofield had personal financial interests and to pay operating expenses of a real estate firm engaged in promoting such allotment, in which firm Sherman Scofield was a partner. Levi T. Scofield had drafted a plan of the lots for said allotment, but had incurred no debts in connection therewith.

(d) $30,948.47 was used from 1920 to 1930 to finance the operations of J. B. LaRue in his attempts to develop a process for extracting aluminum from sand, in which operations Sherman Scofield had a 55 per cent interest.

(e) $11,583.43 was used from 1919 to 1932 to finance the operations of M. W. Muelhauser in his attempt to develop a coal mining machine and safety engineering devices and obtain patents thereon, in which operation Sherman Scofield had a 50 per cent interest.

(f) $5,293.83 was used from 1925 to 1928 to grubstake John T. Wertz in the development of gold mining claims in Wyoming, in which Sherman had a financial interest.

(g) $2,021.08 was used from 1917 to 1926 for the personal use and benefit of William Scofield and consisted of checks drawn to pay his personal bills or checks deposited in his personal checking account at the Union Trust Company.

(h) $18,000 was used from 1917 to 1932 as gifts to Mrs. Lydia Brown, Mrs. Altie Philips, and Mrs. Mabel McCallipe, who were aunts of William and Sherman Scofield, and who had received regular monthly checks from Levi T. Scofield before his death.

(i) The remaining $25,348.31 was used from 1917 to 1932 for a variety of personal purposes, including loans to friends of William and Sherman Scofield, payment of debts of their business associates, payment of debts of Sherman's college fraternity, payments for relatives and for storage of furniture from a residence, none of which disbursements were for trust purposes.

Such funds were disbursed by 3,968 checks drawn by them on the Schofield Building account which they maintained in the Cleveland Trust Company.

Of the total diversions described above, the amount of $31,606.11 had been withdrawn by William and Sherman by checks from trust funds on deposit with the Cleveland Trust Company to repay their personal loans at such bank or to cover overdrafts in their accounts there. Douglas also discovered that from September 1, 1922, until April 30, 1935, additional mortgages to Northwestern had been executed by William and that during such period William, Sherman, and Carlton Schultz, Inc., disbursed a total of $350,454.90 of testamentary trust funds to Northwestern as interest payments on outstanding mortgage loans.

Upon discovering the aforementioned diversions of trust funds, Douglas advised Northwestern that there appeared to be no authority under his grandfather's will for any of the mortgage transactions which had taken place since 1917, nor for the proposed new mortgage transaction for the purpose of obtaining funds for the installation of new elevators. He further advised Northwestern that he objected to the trust's obtaining additional funds from Northwestern for such purpose. Northwestern thereupon, on February 13, 1935, commenced an action in the Court of Common Pleas of Cuyahoga County, Ohio, to foreclose on the outstanding mortgages executed by William which secured his notes as trustee in the total amount of $660,000.

On April 25, 1935, Douglas qualified as the successor testamentary trustee to William. After qualifying as successor trustee, Douglas filed an answer to Northwestern's foreclosure suit denying the validity of the notes and mortgages sued upon. He, in addition, filed a cross-petition against Northwestern claiming a recovery of $796,773.05 for interest wrongfully paid to Northwestern and for damages as a result of other breaches of trust in which Northwestern had allegedly participated.

On December 13, 1935, Douglas filed an action against William and Sherman Scofield seeking recovery from them in the amount of $1,066,320.02 for alleged diversions of trust funds. At that time, neither William nor Sherman had assets of any importance other than their contingent interest in the trust corpus which would vest in them if they lived until September 14, 1942.

On December 5, 1935, Douglas filed an action against the Cleveland Trust Company alleging that it participated with William and Sherman in breaches of the testamentary trust with notice and knowledge of its participation in the diversion of trust funds. Such action sought recovery from the bank in the amount of $1,069,306.08. In March and April 1936, Douglas filed a total of 62 separate complaints

against that many persons for withholding assets of the testamentary trust which they had received as a result of the alleged diversion of trust funds. The aggregate amount claimed in such suits was $48,128.84.

Trial of the Northwestern foreclosure action was held in December 1936 and resulted in a settlement agreement reached by the parties in January 1937. Such settlement agreement provided for the execution of a new mortgage in the amount of $655,000. In 1940, judgments were entered against William and Sherman on their confessed liability in the respective amounts of $2,541,939.31 and $2,464,928.70. Neither William nor Sherman possessed any assets on the date of the judgment. William died on July 3, 1942, and Sherman died on August 4, 1942, prior to the time when their interest in the trust corpus vested in them. Sherman Scofield died insolvent; the net assets of William's estate in the amount of $1,788.74 were paid over to Douglas as successor testamentary trustee in 1946.

Trial of the action against the Cleveland Trust Company was held in March and April 1942, and the trial court entered its opinion on March 31, 1943. The court rendered judgment against the bank in the principal amount of $10,000, which was a full recovery on the claimed diversion of trust funds in that amount represented by two checks of $5,000 each paid by the Standard Drug Company, a tenant in the Schofield Building, as advance rent. Such payment had been made by the Drug Company to William in 1932 under the following circumstances: William and Sherman were makers of a promissory note in the amount of $10,070.41, which had been given in payment of machinery purchased by the Self-Clasp Envelope Company. The Cleveland Trust Company entered into a trust agreement with the promisee of the note to collect the amount due. The bank made demand on William and Sherman; and to prevent the sale of patents belonging to The Self-Clasp Envelope Company, which secured the note, they obtained two checks from the Standard Drug Company made payable to the order of "Wm. M. Scofield, Trustee of the Estate of Levi T. Scofield," which the Drug Company gave as advance rental for premises which it occupied in the Schofield Building. The bank, through an officer in its corporate trust department, accepted the two checks from William in payment of his and Sherman's personal indebtedness to the promisee of the note.

The court held the bank liable for the amount of checks drawn by William and Sherman on trust funds and used by them to pay their personal loans at the bank or to cover overdrafts in their personal bank accounts, in the additional amount of $31,606.11, but denied recovery of such sum because of the bar of the statute of limitation. In the course of its opinion, the court stated:

We now take up one of the chief questions in this case. There is a line of authority which follows the case of *Bischoff* v. *Yorkville Bank*, 218 N. Y. 106, which holds, in effect, that if a fiduciary makes a deposit to his personal account from trust funds by way of a check drawn to him and then from his personal account pays his indebtedness to the bank, that the bank is chargeable with notice to all misapplications of trust funds thereafter made by him by withdrawals from the trust fund.

The plaintiff contends that in the case at bar the Bank received checks of the fiduciary and applied the same in payment of the personal indebtedness of William and Sherman, and since, among the first checks drawn on the fiduciary account after the death of Levi, was a check covering an overdraft of Sherman's account with the Bank, that thereafter the Bank had a continuing notice and is liable for any subsequent diversions.

If we adopt the theory of the *Bischoff* case, the Bank is liable for practically all of the diversions of the Trustee. We are satisfied that the *Bischoff* case does not announce the rule at common law nor the majority rule. We prefer the rule announced in the Massachusetts case of *Allen* v. *Puritan*, 211 Mass. 409, where it is held, in a similar case, that the bank was liable only for the amount of the diversions used to pay its own indebtedness. The Ohio courts have not spoken on this phase of the law. The whole question largely resolves itself into one of notice. The answer to this question must be determined from the facts in every case. The *Bischoff* case did not pass upon the facts precisely similar to the case at bar, and the Court said so in its opinion. It is for us to determine, therefore, whether or not, from all the facts and circumstances in this case, the Bank had notice of such conduct on the part of the Trustee as would render it liable for the diversion of trust funds for non-trust purposes. While in retrospect we see many irregularities and much to criticize, we must remember that "hindsight" is better than "foresight" and that these irregularities in themselves were not vicious and do not affect the real cause of this lawsuit.

\*        \*        \*        \*        \*        \*        \*

After a careful examination of all of the evidence, we have reached the conclusion that except as hereinafter set forth the notice to the Bank of the irregularities of the Trustee and of the diversions of the trust funds cannot be said to be actual notice. There is no evidence that the Bank violated any established banking practices. In this case, unlike many other cases involving questions of the liability of depository, there is no element of bad faith involved on the part of the Bank. There was no deceit or any evidence of fraudulent conduct on the part of the Bank. Whatever knowledge the Bank had must, in our opinion, be based upon the theory of constructive notice. It is for this reason, no doubt, that the plaintiff places so much confidence in the *Bischoff* case, because unless the doctrine of that case is followed in the case at bar, there is no evidence of notice to the Bank of most of the diversions of the Trustee.

One of the reasons why the *Bischoff* case has been criticized is that it imposes too great a burden of inquiry upon the depository. It seems to us that this is true. If the rule in the *Bischoff* case is followed in the case at bar, it not only imposes an unreasonable burden upon the Bank, but it also has the effect of practically nullifying the wishes of the testator, because to carry out the theory which the plaintiff urges, the Bank would, in effect, become the Trustee. \* \* \*

Douglas appealed the decision of the trial court which was affirmed by the Court of Appeals of Cuyahoga County. He further appealed

the decision to the Supreme Court of Ohio, which, in 1948, disagreed with the lower court's application of the statute of limitation and granted an additional judgment against the bank in the amount of $31,606.11, together with interest in the amount of $56,152.85, and costs of $2,567.56. The bank paid $76,308.96 of such judgment in March 1948, and the balance in August of that year.

In 1948, after the decision of the Supreme Court in the Cleveland Trust Company case, Douglas proceeded against the 62 defendants against which he had filed complaints in 1936. In 1948, he recovered $5,465.99 on 58 of such claims. The 4 remaining claims in the amount of $18,080.01 were turned over to attorneys for further prosecution, and 2 of such claims were settled in 1949 for $1,750. One was settled in 1953 for $500, and the remaining claim was abandoned in 1953.

The testamentary trust was in existence throughout 1948, and was still in existence at the date of the hearing.

On its income tax return for the taxable year January 1, 1948, to December 31, 1948, the testamentary trust claimed a loss in the amount of $949,968.17 because of diversion of its funds which occurred prior to 1935, and reported a net operating loss for the year of $919,807.87. It distributed $53,900 to its beneficiaries during such year. In 1949, the trust filed claims for refund of income taxes paid by it in 1946 and 1947, based on a carryback of the loss sustained in 1948 to the two previous years.

In a deficiency notice dated October 9, 1951, the respondent determined deficiencies against the testamentary trust for 1946 and 1947 and for the period January 1 to June 30, 1948. The deficiencies so determined were based on the disallowance of the $949,968.17 loss claimed in 1948 and the loss carryback to the 2 previous years. A part of the deficiency determined for the period January 1 to June 30, 1948, was based on the grounds that the $10,000 recovery against the Cleveland Trust Company on the Standard Drug Company's checks constituted additional income during such period.

The petitoners in Docket Nos. 38303, 38304, 38305, 38306, and 38307 claim that the distributions made to them by the testamentary trust in 1946, 1947, and 1948, which they originally reported as their distributive share of trust income, were distributions of trust corpus since the trust itself sustained a net operating loss in 1948 which, when carried back, resulted in a loss for all three years.

The testamentary trust failed to establish that it sustained a deductible loss in 1948 because of diversions of trust funds which occurred prior to 1935.

OPINION.

The first issue raised herein is whether the deficiency notice in Docket No. 38302, in which the respondent determined a deficiency against the Estate of Levi T. Scofield for the fiscal period January 1 to June 30, 1948, is a valid deficiency notice. The petitioner claims that such notice is invalid because it determined a deficiency for only a portion of its taxable year when it was in existence throughout the year, received income and incurred expenses throughout the year, and filed its return for the entire calendar year 1948.

We think the petitioner's objection to the deficiency notice is well taken. We have long followed the rule that the respondent has no authority to determine a deficiency for a fractional part of a taxpayer's correct taxable year, and that where the respondent does so determine a deficiency for an unauthorized period, there is no deficiency, and that a decision accordingly will be entered for the taxpayer. *Columbia River Orchards, Inc.*, 15 T. C. 253 (1950); *Oklahoma Contracting Corporation*, 35 B. T. A. 232 (1937); *Pittsburgh & West Virginia Railway Co.*, 32 B. T. A. 66 (1935); *Elgin Compress Co.*, 31 B. T. A. 273 (1934); and *Mrs. Grant Smith*, 26 B. T. A. 1178 (1932).

We find nothing in the instant case which distinguishes it from the above-cited cases. We, therefore, conclude that the respondent's notice of deficiency for the period January 1 to June 30, 1948, in Docket No. 38302 was invalid and that there is no deficiency in income tax for the Estate of Levi T. Scofield for that period.

Although our determination with respect to the first issue raised herein eliminates the only deficiency determined against the testamentary trust for 1948, we nevertheless have to decide whether the trust did, in fact, sustain a net operating loss for that year because of the deficiency determined against it in 1946 and 1947 as a result of respondent's disallowance of the carryback of such 1948 net operating loss to those two previous years.

The petitioner now claims that the amount of the net operating loss sustained by it in 1948 was $414,917.35.

The parties apparently agree that the nature of the diversions which resulted in the loss which petitioner sustained are more closely analogous to an embezzlement of its funds than to any other type of loss. The year in which a taxpayer may claim a loss as the result of embezzlement depends upon when the loss was, in fact, sustained. This is a factual question which must be decided on the basis of all the relevant circumstances. Treasury Regulations 111, section 29.43–2 provides that an embezzlement loss is to be taken ordinarily in the year when

the embezzlement occurred. "Ordinarily" does not mean always; and, hence, in some instances, embezzlement losses are deductible in the year in which the taxpayer discovers the embezzlement. *Alison* v. *United States*, 344 U. S. 167 (1952).

The record before us indicates that the extent of the diversions of trust funds was fully disclosed sometime in 1935. The two persons principally responsible for the diversion were William and Sherman Scofield. They had no assets of any importance in 1935 other than their contingent interest in the corpus of the trust which would vest in them if they lived until September 14, 1942. In 1940, the successor trustee secured a judgment by confession against them. They had no assets at that time other than their contingent interest in the trust corpus. Both men died before such trust corpus vested in them.

Even in view of those facts, the petitioner argues that the extent of the loss which it sustained as a result of William's and Sherman's diversion of trust funds was not ascertainable until its suit against the Cleveland Trust Company was finally settled; and, that because it was not ascertainable until that time it was not "sustained" until then.

We cannot agree with the petitioner's position for the reason that the possibility of recovery against the bank was too remote to render the extent of the diversion loss incapable of valuation prior to the time such suit was settled. The principal hope of recovery against the bank depended upon the petitioner's persuading the Ohio courts to adopt a minority view with respect to the liability of a depository of trust funds. The common law and the majority rule of law followed in many States did not place on banks or other depositories of fiduciary funds the degree of responsibility which the petitioner hoped to impute to the bank in question here. At this date we, of course, have the benefit of the trial court's opinion, twice affirmed, with respect to this question. But examining that opinion for nothing more than a statement as to existing Ohio law at the time the suit was filed, it seems clear from a reading of it that there should have been little doubt in anyone's mind at that time that any hope of recovery against the bank was largely problematical.

This is not a case where the taxpayer sustaining a loss sued to recover on some type of indemnity contract. See *Allied Furriers Corporation*, 24 B. T. A. 457 (1931); *Commissioner* v. *Harwick*, 184 F. 2d 835 (C. A. 5, 1950). All that the petitioner had here was an unadjudicated claim against a third party which it alleged had participated with the principal malfactors in diverting its funds..

The time when embezzlement losses or losses of any other kind are to be deducted calls for practical, realistic tests. The Supreme Court long ago said that the statute does not require a taxpayer to be an

incorrigible optimist.[2]   Neither, we think, does it permit him to be one.   The essence of the income tax is that it should produce revenue ascertainable and payable to the Government at regular annual intervals which, of course, presupposes that income in fact received, and losses in fact sustained, in any given taxable year, will be accounted for during such year.   It means that deductions for losses may not be postponed until some future date to suit the convenience, whim, or exaggerrated optimism of a particular taxpayer.   We think that the petitioner herein deducted its loss only after the last possible hope of recoupment expired with the mandate of the Supreme Court of Ohio in 1948. Any reasonable taxpayer, we think, would have claimed its loss long before.   See *Commissioner* v. *Highway Trailer Co.*, 72 F. 2d 913 (C. A. 7, 1934), certiorari denied 293 U. S: 626 (1935).

We therefore hold, on these facts, that the Estate of Levi T. Scofield has failed to prove it sustained a deductible loss in 1948 and, hence, it had no net operating loss in that year which could be carried back to its two previous taxable years.

The third issue raised herein is whether distributions which the beneficiaries received from the testamentary trust were distributions of income or distributions of corpus.   This issue arises because of refunds claimed by the petitioners in Docket Nos. 38303, 38304, 38305, 38306, and 38307 [3] on the grounds that because the testamentary trust sustained a net operating loss in 1948 which it should be entitled to carry back to 1946 and 1947, the distributions received by them in all of those years and originally reported as income should have been reported as distributions of corpus.

Having determined that the trust sustained no net operating loss in 1948, it follows that the beneficiaries correctly reported distributions made by the trust to them in 1946, 1947, and 1948 as taxable income.

Since we have held that the deficiency notice in Docket No. 38302 was invalid, we do not decide the fourth issue as to whether a $10,000 recovery by the testamentary trust in 1948 constituted taxable income to it in that year.

*Issues 5 and 6.*

FINDINGS OF FACT.

The foreclosure suit which Northwestern filed in February 1935 prayed that a receiver be appointed to take possession of the Schofield

---

[2] *United States* v. *White Dental Co.*, 274 U. S. 398 (1927).

[3] Douglas F. Schofield transferred a part of his beneficial interest in the testamentary trust to a trust created by him for his children.   Such trust is, therefore, a petitioner herein.

Building, collect its rents, and apply the net rents to the mortgage indebtedness owed to Northwestern. At the time the suit was filed, Carlton Schultz, Inc., was managing the Schofield Building. In August 1935, Douglas F. Schofield, as successor testamentary trustee, forcibly removed all of the books and records pertaining to the Schofield Building from the possession of Carlton Schultz, Inc., and advised all of the building's tenants that thereafter they were to pay their rent to him.

Northwestern objected to Douglas' management of the building; and, on September 26, 1935, an agreement was reached between Northwestern and Douglas whereby Douglas was to have general supervisory control over Carlton Schultz, Inc.'s management of the building. Northwestern approved a payment to Douglas as the successor trustee of $200 per month out of the rents collected by Carlton Schultz, Inc., which payments were to apply on trust fees to which Douglas might be entitled.

The settlement of the Northwestern foreclosure suit in February 1937 permitted payment of trustee's fees to Douglas of 7 per cent of the building's gross income less other management expenses. The remaining rents were to be applied on the outstanding mortgage. Not until November 23, 1946, when a new mortgage extension agreement was executed with Northwestern, was the restriction on the amount of fees to be paid Douglas, out of rents from the Schofield Building, lifted. Rents from the building were the only source of trust income during the period from 1935 to 1946 from which Douglas could have been paid fees.

Douglas, as successor trustee, filed seven partial accounts with the Probate Court covering the receipt and disbursement of trust funds from May 1, 1935, through December 31, 1948, each of which was approved by the court. In conjunction with such partial accounting, he filed an application for compensation for services rendered during the period covered by the accounts. The court allowed compensation for the period in which services were rendered in the following amounts, on dates indicated:

| Partial account numbers | Period of services for which allowed | Amount allowed | Date allowed |
|---|---|---|---|
| 1st | Dec. 1, 1934 through Apr. 30, 1937 | $38,803.45 | May 13, 1937 |
| 2d | May 1, 1937 through Apr. 30, 1939 | 20,000.00 | May 10, 1939 |
| 3d | May 1, 1939 through Apr. 30, 1941 | 30,000.00 | June 28, 1941 |
| 4th | May 1, 1941 through Apr. 30, 1943 | 25,000.00 | July 6, 1943 |
| 5th | May 1, 1941 through Mar. 31, 1944 | 15,000.00 | |
| 6th | Apr. 1, 1944 through Mar. 31, 1946 | 40,000.00 | July 2, 1946 |
| 7th | Apr. 1, 1946 through Dec. 31, 1948 | 62,500.00 | Feb. 21, 1949 |
| Total | | $231,303.45 | |

Set forth below are the amounts actually received by the successor trustee during the indicated years:

| Calendar year | Yearly apportionment of probate court allowance | Payment actually received in year | Difference between allowance and payment |
|---|---|---|---|
| 1934 | $1,338.05 | ---------- | $1,338.05 |
| 1935 | 16,056.60 | $603.45 | 15,453.15 |
| 1936 | 16,056.60 | 2,400.00 | 13,656.60 |
| 1937 | 12,018.87 | 4,454.46 | 7,564.41 |
| Amount unpaid, 1934–1937, paid in 1946 | | | $38,012.21 |
| 1938 | $10,000.00 | $9,900.00 | $100.00 |
| 1939 | 13,333.33 | 7,000.00 | 6,333.33 |
| 1940 | 15,000.00 | 8,245.54 | 6,754.46 |
| 1941 | 13,333.33 | 7,800.00 | 5,533.33 |
| 1942 | 12,500.00 | 5,389.40 | 7,110.60 |
| 1943 | 15,075.77 | 5,110.75 | 9,965.02 |
| 1944 | 19,090.90 | 4,758.60 | 14,332.30 |
| Amount unpaid, 1938–1944, paid in 1947 | | | $50,129.04 |
| 1945 | $20,000.00 | $5,983.58 | $14,016.42 |
| 1946 | 22,045.46 | 15,197.17 | 6,848.29 |
| 1947 | 22,727.27 | ---------- | 22,727.27 |
| Amount unpaid, 1945–1947, paid in 1948 | | | $43,591.98 |
| 1948 | $22,727.27 | $22,727.27 | ---------- |
| Totals | $231,303.45 | $99,570.22 | $131,733.23 |

On the joint returns which Douglas and his wife, Mary, filed for 1946, 1947, and 1948, he computed the tax on the amounts of trustee fees received by him in those years for services rendered in earlier years under the provisions of section 107 of the 1939 Code. Before allocating such amounts to the years in which earned, he deducted from the total amount of such trustee fees the amounts paid to his sister, Josephine Schofield Thompson, for services which she had rendered in connection with trust business from June 1935 to March 1944. He now claims that the payments made to Josephine should be deducted after allocation of such fees under section 107.

The respondent determined that petitioner was not entitled to the benefits of section 107 in computing the tax on trustee fees received by him in 1946, 1947, and 1948, after deducting the amounts paid to his sister Josephine.

OPINION.

The petition in Docket No. 38308 alleges that the trustee fees which Douglas received in 1946 for services performed in prior years should be taxed under the provisions of section 107 (d).

The respondent's principal objection to the applicability of subsection (d) to the fees in question is that a trustee is not an "employee"

within the meaning of that subsection; and, hence, that the trustee fees which Douglas received did not constitute "back pay" within the meaning of the statute.

Section 107 (a) and (d) is set forth in the margin.[4] In proceedings before this Court involving the applicability of section 107 to fees received by trustees, the claims that such section is applicable have been made under the provisions of subsection (a). *Civiletti* v. *Commissioner*, 152 F. 2d 332 (C. A. 2, 1945), affirming 3 T. C. 1274 (1944), certiorari denied 327 U. S. 804 (1946); *Smart* v. *Commissioner*, 152 F. 2d 333 (C. A. 2, 1945), affirming 4 T. C. 846 (1945), certiorari denied 327 U. S. 804 (1946); *Estate of W. P. McJunkin*, 25 T. C. 16 (1955); *W. Harold Warren*, 20 T. C. 378 (1953); *Gordon S. Wayman*, 14 T. C. 1267 (1950); and *Ralph E. Lum*, 12 T. C. 375 (1949).

In *Cowan* v. *Henslee*, 180 F. 2d 73 (C. A. 6, 1950), and *Wardall* v. *United States*, 125 Ct. Cl. 128, 111 F. Supp. 885 (1953), trustees argued

---

[4] SEC. 107. COMPENSATION FOR SERVICES RENDERED FOR A PERIOD OF THIRTY-SIX MONTHS OR MORE AND BACK PAY.

.(a) PERSONAL SERVICES.——If at least 80 per centum of the total compensation for personal services covering a period of thirty-six calendar months or more (from the beginning to the completion of such services) is received or accrued in one taxable year by an individual or a partnership, the tax attributable to any part thereof which is included in the gross income of any individual shall not be greater than the aggregate of the taxes attributable to such part had it been included in the gross income of such individual ratably over that part of the period which precedes the date of such receipt or accrual.

\*     \*     \*     \*     \*     \*     \*

(d) BACK PAY.——

(1) IN GENERAL.——If the amount of the back pay received or accrued by an individual during the taxable year exceeds 15 per centum of the gross income of the individual for such year, the part of the tax attributable to the inclusion of such back pay in gross income for the taxable year shall not be greater than the aggregate of the increases in the taxes which would have resulted from the inclusion of the respective portions of such back pay in gross income for the taxable years to which such portions are respectively attributable, as determined under regulations prescribed by the Commissioner with the approval of the Secretary.

(2) DEFINITION OF BACK PAY.——For the purposes of this subsection, "back pay" means (A) remuneration, including wages, salaries, retirement pay, and other similar compensation, which is received or accrued during the taxable year by an employee for services performed prior to the taxable year for his employer and which would have been paid prior to the taxable year except for the intervention of one of the following events; (i) bankruptcy or receivership of the employer; (ii) dispute as to the liability of the employer to pay such remuneration, which is determined after the commencement of court proceedings; (iii) if the employer is the United States, a State, a Territory, or any political subdivision thereof, or the District of Columbia, or any agency or instrumentality of any of the foregoing, lack of funds appropriated to pay such remuneration; or (iv) any other event determined to be similar in nature under regulations prescribed by the Commissioner with the approval of the Secretary; and (B) wages or salaries which are received or accrued during the taxable year by an employee for services performed prior to the taxable year for his employer and which constitute retroactive wage or salary increases ordered, recommended, or approved by any Federal or State agency, and made retroactive to any period prior to the taxable year; and (C) payments which are received or accrued during the taxable year as the result of an alleged violation by an employer of any State or Federal law relating to labor standards or practices, and which are determined under regulations prescribed by the Commissioner with the approval of the Secretary to be attributable to a prior taxable year. Amounts not includible in gross income under this chapter shall not constitute "back pay."

that their fees were "back pay" within the meaning of subsection (d). In both of those cases, the courts disallowed the application of that subsection to the fees there in question, but did not decide whether trustees' fees, as such, were, in fact, "back pay" within the meaning of the statute.

We agree with the respondent, however, that the trustee fees here in issue are not "back pay" within the meaning of subsection (d). We think that the legislative history clearly explains the purpose of Congress in adding subsection (d) to section 107. The subsection was proposed by the House in its version of the Revenue Act of 1943.[5] The report of the Committee on Ways and Means[6] explained the proposed addition as follows:

As a result of an alleged unfair labor practice of his employer under the National Labor Relations Act, an alleged violation of section 6 or 7 of the Fair Labor Standards Act of 1938, or a retroactive wage increase provided for by the National War Labor Board, an individual taxpayer may receive during the taxable year back pay which is in part attributable to one or more prior years. In this event the back pay may be subject to a greater income tax than if it had been received in the years from which it arises. Section 113 of the bill adds a new section 110 to the Code to limit the tax in this event. * * *

The Senate Finance Committee[7] rejected the House proposal with the following explanation:

The House adopted a provision relating to the taxes on back pay received by an individual for services rendered in a prior year because of alleged unfair labor practice under the National Labor Relations Act, or a violation of the Fair Labor Standards Act, or a retroactive increase approved by the National War Labor Board. Your committee was unable to agree with this provision because of its limited application and it has, therefore, been omitted from the bill.

A conference committee[8] agreed on subsection (d) as it first appeared in the 1943 Act. The committee explained its provisions as follows:

Amendment No. 30: This amendment eliminates the provision of the House bill adding a new section to the Code to limit the tax attributable to back pay received or accrued by an individual during the taxable year. The House recedes with a change in section number and with the following amendment:

There is added to section 107 of the Code a new subsection (d), which expands the definition of "back pay" to include all compensation received or accrued during the taxable year by an employee for services performed prior to the taxable year for his employer, which would have been paid prior to the taxable year but for the occurrence of one of the following events: (1) Bankruptcy or receivership of the employer; (2) dispute as to the liability of the employer to pay such remuneration, which is determined after the commencement of court proceedings; (3) if the employer is the United States, a State, a Territory, or any political subdivision thereof, or the District of Columbia, or any agency or instrumentality of any of the foregoing, lack of funds appropriated to pay

---

[5] 58 Stat. 21.
[6] H. Rept. No. 871, 78th Cong., 1st Sess. (1943), p. 48.
[7] S. Rept. No. 627, 78th Cong., 1st Sess. (1943), p. 22.
[8] H. Rept. No. 1079, 78th Cong., 2d Sess. (1944), pp. 44–45.

such remuneration; or (4) any other event determined to be similar in nature under regulations prescribed by the Commissioner with the approval of the Secretary. The term also includes retroactive wage or salary increases, received in respect of services performed in a prior taxable year, which have been ordered, recommended, or approved by any Federal or State agency. "Back pay" also covers payments arising out of an alleged violation by an employer of any State or Federal law (such as the National Labor Relations Act or the Fair Labor Standards Act of 1938) relating to labor standards or practices, to the extent such payments are determined to be attributable to a prior year. Any amount which is not includible in gross income under Chapter 1 of the Code shall not constitute back pay. Remuneration for personal services, including pensions, retirement pay, bonuses, or commissions, which are paid in the current year in accordance with the usual practice or custom of the employer, are not "back pay," even though such amounts are received in respect of services performed in a prior year (or prior years). The term refers only to remuneration the payment of which has been deferred by reason of the unusual circumstances of the type specified in the definition.

The new subsection provides that if the amount of such back pay exceeds 15 percent of the gross income of the individual for the taxable year, the part of the tax for such year which is attributable to the inclusion of the back pay in gross income shall not exceed the sum of the increases in the taxes which would result from the inclusion of the respective portions of the back pay in gross income for the taxable years to which such portions are respectively attributable, as determined under regulations prescribed by the Commissioner with the approval of the Secretary.

We think the provisions of subsection (d) must be read in conjunction with the provisions of subsection (a). It is apparent to us that Congress meant to confine the special treatment provided by subsection (d) to the back pay or back wages of employees in the commonly accepted meaning of that term, which is to say, those persons who are wage earners, salaried employees, or employees who are compensated by commissions for services performed for, and under the direction and control of, an employer. Subsection (a), on the other hand, covers a much broader group of persons, including self-employed persons and persons who act in a fiduciary capacity, responsible in their accounting only to a court. If subsection (d) included all those persons to whom subsection (a) is applicable, it would mean that such persons would have "two bites at the apple." We cannot believe that Congress ever intended such liberal treatment for all persons who received lump-sum compensation for personal services extending over a period of years. We think what the Court of Appeals said in *Smart* v. *Commissioner, supra,* at p. 335, with reference to subsection (a) is equally applicable to all parts of section 107:

the section is an exemption and as such must submit to close scrutiny; and— what is more important—Congress has been sparing in the relief given. * * * we have to deal with a statute which not only has been amended, but amended with a precision which, it seems to us, should forbid any assumption that it is infused with a broad purpose, which we should ramify as the occasion may demand. * * *

Hence, we conclude that the trustee fees here in question did not constitute "back pay" within the meaning of section 107 (d).

Having so determined, it is unnecessary to decide the sixth issue as to whether the amounts paid to Josephine Schofield Thompson are deductible by Douglas before or after allocation of the trustee fees received by him is made under section 107.

*Issue 7.*

#### FINDINGS OF FACT.

Early in 1942, Douglas F. Schofield, as the successor testamentary trustee, felt that the beneficiaries of the trust should give some consideration to a plan for holding and operating the principal asset of the trust, the Schofield Building, when the beneficiaries' interest therein vested on September 14, 1942. With that consideration in mind, Douglas wrote to the attorney for his aunt, Harriet E. Scofield Bushnell, in February 1942, suggesting that some type of a land trust might be formed to take over the building from the testamentary trust for the following reasons:

The suggested solution presents a minimum of change in the present plan of building ownership and control. From a tax viewpoint, considerable economies would be retained in comparison with the only probable alternative—the establishment of a corporation. These economies would be particularly noticeable in respect to the interest of the beneficiaries, none of whom would enjoy paying personal property taxes on stock with uncertain and unlikely dividends.

Douglas was inducted into the Army in May 1942, and it was decided by the beneficiaries to leave the Schofield Building in the testamentary trust until some future time.

On September 14, 1942, the beneficiaries of the testamentary trust succeeded to vested interests in the Schofield Building as follows:

| | |
|---|---|
| Harriet E. Scofield Bushnell | ⅓ |
| Mary Jane Scofield (daughter of William M. Scofield) | ⅓ |
| Douglas F. Schofield | ⅙ |
| Josephine Schofield | ⅙ |

The building contained 123,000 square feet of rentable space. It has had as many as 150 to 250 tenants and from 35 to 45 full-time employees.

In 1948, Douglas again proposed the creation of a land trust to take title of the Schofield Building and discussed that proposal with the other beneficiaries. It was decided that Harriet would sell her interest in the building to the other beneficiaries. In March 1948, the remaining beneficiaries, Douglas F. Schofield, Mary Jane Scofield Demmon, and Josephine Schofield Thompson signed an agreement and declaration creating a land trust. Harriet transferred her interest

in the Schofield Building to the remaining beneficiaries, and the land trust agreement with the building as its corpus was made effective as of July 1, 1948. The Schofield Building has thereafter been operated pursuant to the provisions of the land trust agreement effective on that date.

The agreement provided, in part, as follows: The interest of the beneficiaries of the land trust was to be represented by land trust certificates of beneficial ownership divided into 3,000 indivisible equal shares; the trustee was to keep a register of the names and interest of the beneficiaries and a proper transfer book showing receipts and disbursements of the trust estate; the land trust certificates could be assigned and transferred by the holders thereof; no beneficiary had any legal title to the trust property, real or personal, and had no right to call for a partition of the trust estate during the continuance of the land trust; no transfer by operation of law of the interests of a beneficiary could terminate the trust nor could any legal representative of a deceased beneficiary have an accounting of the trust or take any court action against the trust estate or the trustee; no assessment could ever be made on the beneficiaries and the trustee had no power to bind such beneficiaries personally; anyone contracting with the trustee could look only to the funds and property of the trust for payment under such contract or for the payment of any debt; neither trustee nor beneficiaries were, in any event, personally liable for the obligations of the trust; beneficiaries possessing 2,001 or more shares of equitable ownership could change the trustee; the trustee had full and ample powers to control and manage the Schofield Building as if he were dealing with his own property except that he could not tear down or destroy the building without the consent of beneficiaries holding 2,001 or more shares of equitable ownership; the land trust was to terminate upon the sale of all of its real assets and payment of all of its debts and obligations and the disposition of the proceeds among the beneficiaries; and before a sale of all assets could be made, beneficiaries holding 2,001 shares of equitable ownership were required to consent to such sale. Douglas F. Schofield was named the trustee of the land trust.

In asserting the deficiency here in issue, the respondent made the following determination:

Your income tax return for the period ended December 31, 1948 was filed on Form 1041 as a fiduciary return and the income and tax was computed as that of a trust. It is held that the income is that of an association and is subject to tax applicable to a corporation.

OPINION.

Section 3797 of the 1939 Code defines corporations as including associations. The substance of the respondent's determination herein is

that the trust agreement between the beneficiaries who held a vested beneficial interest in the Schofield Building created an association of such beneficiaries which is taxable as a corporation and not as a pure trust. He argues that this is so because the trust agreement in question created an association of the beneficiaries to carry on a business and divide the profits therefrom with centralized management of such business activities being in the trustee.

The petitioner, on the other hand, argues that it was a pure trust which was created and existed solely for the purpose of preserving, holding, and managing the trust corpus for the benefit of the beneficiaries.

This is a question which has been before the courts on a number of occasions. We think the respondent's determination here was correct and that the facts of the instant case bring it well within the scope of the following decisions wherein trusts, markedly similar to the one before us here, have been held to be taxable as corporations: *Morrissey* v. *Commissioner*, 296 U. S. 344 (1935) ; *Swanson* v. *Commissioner*, 296 U. S. 362 (1935) ; *Helvering* v. *Coleman-Gilbert*, 296 U. S. 369 (1935) ; *Hecht* v. *Malley*, 265 U. S. 144 (1924) ; *Main-Hammond Land Trust* v. *Commissioner*, 200 F. 2d 308 (C. A. 6, 1952), affirming 17 T. C. 942 (1951) ; *Sherman* v. *Commissioner*, 146 F. 2d 219 (C. A. 6, 1944), affirming a Memorandum Opinion of this Court, entered August 4, 1943; *Title Insurance & Trust Co.* v. *Commissioner*, 100 F. 2d 482 (C. A. 9, 1938), affirming a Memorandum Opinion of this Court, entered March 31, 1938.

We think the holding, renting, and managing of the Schofield Building constituted the conduct of a business activity, *Hecht* v. *Malley*, *supra*. The beneficiaries, by virtue of the land trust agreement, reaped the profits from their association and secured the centralized management of their undertaking through a designated representative, *Helvering* v. *Coleman-Gilbert*, *supra*. Such cases as *Lewis & Co.* v. *Commissioner*, 301 U. S. 385 (1937) ; *Cleveland Trust Co.* v. *Commissioner*, 115 F. 2d 481 (C. A. 6, 1940), certiorari denied 312 U. S. 704 (1941) ; *Myers* v. *Commissioner*, 89 F. 2d 86 (C. A. 7, 1937) ; *George I. Fullerton*, 22 T. C. 372 (1954) ; *Royalty Participation Trust*, 20 T. C. 466 (1953) ; and *Sears* v. *Hassett*, 45 F. Supp. 772 (D. Mass., 1942), cited by the petitioner in support of its argument that it was an ordinary trust which did nothing more than conserve property, are distinguishable from the above-cited cases.

We feel that no purpose would be served by a detailed analysis comparing the facts of the cases relied on by the petitioner with those cited above which we think are controlling here.

In this case, as in others where the Government has sought to tax a trust as a corporation, it is obvious that many ordinary attributes of a true trust bear marked similarity to the attributes of corporate or-

ganization. But as the Supreme Court said in *Morrissey* v. *Commissioner*, *supra*, pp. 359–360:

It is no answer to say that these advantages flow from the very nature of trusts. For the question has arisen because of the use and adaptation of the trust mechanism. The suggestion ignores the postulate that we are considering those trusts which have the distinctive feature of being created to enable the participants to carry on a business and divide the gains which accrue from their common undertaking,—trusts that thus satisfy the primary conception of association and have the attributes to which we have referred, distinguishing them from partnerships. In such a case, we think that these attributes make the trust sufficiently analogous to corporate organization to justify the conclusion that Congress intended that the income of the enterprise should be taxed in the same manner as that of corporations.

*Decisions will be entered under Rule 50.*