DeWITT C. THOMPSON, III AND DIANA R. THOMPSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; THOMPSON & GREEN MACHINERY CO., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, RespondentThompson v. CommissionerDocket Nos. 8307-75, 8314-75, 4325-76, 4326-76, 5125-80.United States Tax CourtT.C. Memo 1983-81; 1983 Tax Ct. Memo LEXIS 700; 45 T.C.M. (CCH) 693; T.C.M. (RIA) 83081; February 8, 1983. Ervin M. Entrekin and Mark H. Westlake, for the petitioners. Charles W. Kite, for the respondent. PARKERMEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: DeWitt C. Thompson, III and Diana R. ThompsonDocket No.YearDeficiency8307-751971$29,810.294326-76197212,268.184326-76197318,826.36*703 Thompson & Green Machinery Co., Inc.Docket No.YearDeficiency8314-751971$272,255.934325-76197361,938.635125-801976392,830.88After concessions by both parties, 1 the following issues remain for our decision: 1. Whether a debt, charged off to petitioner Thompson & Green Machinery Co., Inc.'s bad debt reserve in 1971 and used in determining the addition to its bad debt reserve for that year under the "Black Motor" formula, was wholly or partially worthless in 1971, and*704 whether respondent abused his discretion in redetermining the allowable addition to petitioner's bad debt reserve for that year; 2. Whether petitioner Thompson & Green Machinery Co., Inc.'s addition to its bad debt reserve in 1976 was reasonable and whether respondent abused his discretion in redetermining the allowable addition to the bad debt reserve for that year; 3. Whether interest income received by petitioner Thompson & Green Machinery Co., Inc., from political subdivisions of the State of Tennessee was excludable as exempt interest income under section 103; 2 and 4. Whether petitioner Thompson & Green Machinery Co., Inc., is entitled to deductions for the payment of certain travel and entertainment expenses under sections 162 and 274, and, if the deductions are not allowable, whether certain of those payments constitute constructive dividends to the principal shareholder, petitioner DeWitt C. Thompson, III. FINDINGS*705 OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and exhibits attached thereto are incorporated herein by this reference. Petitioner Thompson & Green Machinery Co., Inc. ("Thompson & Green") is a Tennessee corporation having its principal place of business in Lavergne, Tennessee. The company is a dealer in heavy construction equipment. For the calendar year 1971, Thompson & Green filed its Federal corporate income tax return with the Director, Southeast Service Center, Chamblee, Georgia. For the calendar years 1973 and 1976, Thompson & Green filed its Federal corporate income tax returns with the Internal Revenue Service Center at Memphis, Tennessee. Petitioners DeWitt C. Thompson, III and Diana R. Thompson resided in Nashville, Tennessee, during the taxable years involved and when they filed their petitions in this case. For the calendar years 1971, 1972, and 1973, they filed joint Federal income tax returns with the Internal Revenue Service Center at Memphis, Tennessee. Diana R. Thompson is a party to these proceedings solely because she filed joint Federal income tax returns with her husband. *706 Accordingly, references to an individual petitioner or to "Thompson" will refer solely to DeWitt C. Thompson, III. Thompson is the principal shareholder of Thompson & Green. I. Bad Debt DeductionsA. 1971As of 1970, Thompson & Green had entered into various equipment leases with James T. Gregory, Inc. ("Gregory"). Gregory was in the business of highway construction and was bonded on its highway projects by United States Fidelity and Guaranty Company ("USF&G"). Late in 1970 Gregory suffered severe cash shortages and was unable to meet its obligations under the highway construction contracts.As a result, USF&G took possession and control of Gregory's business in early 1971. USF&G, under its bond, completed Gregory's highway contracts by hiring other contractors to complete the work. USF&G terminated all of Gregory's employees except Gregory's office manager, James Gardner, and his secretary, whom USF&G hired temporarily to help administer the claims against Gregory. Both were terminated by USF&G in May of 1971. USF&G paid all claims made against it as surety on account of Gregory's highway construction contracts, except those of Thompson & Green. After USF&G*707 took over Gregory, Gregory no longer had employees or assets except those in the possession of USF&G, and Gregory has not since acquired assets or resumed business operations. Gregory's corporate charter was revoked November 19, 1971, for nonpayment of franchise taxes. By 1971, Thompson & Green believed that recovering its debt from Gregory was unlikely and that the best hope of collecting was through the surety. At that point the surety had paid all claimants except Thompson & Green, and the principal owner of the Gregory company, apparently motivated by personal animosity, was refusing to cooperate and was trying to keep USF&G from paying Thompson & Green. Thompson & Green finally filed suit in early 1971 against the surety, USF&G, and against Gregory for unpaid equipment rentals and parts, services, and repairs. Gregory asserted a counterclaim against Thompson & Green, alleging that the agreements were not leases but conditional sales contracts and that it had an equity interest in the equipment that Thompson & Green had repossessed from it. In the retainer agreement for the USF&G litigation, Thompson & Green agreed to pay its attorneys a minimum of $10,000, and 30 percent*708 of the total recovery (minus the $10,000 minimum). Under Tennessee law, claimants cannot recover attorneys' fees from the surety and Thompson & Green understood this when they filed suit in 1971. On December 31, 1971, Thompson & Green's accounts receivable shown on its Federal income tax return included $416,276.15 due from Gregory. One receivable was a "machine account" for $405,704.12. The other was a "parts and service account" for $10,572.03. At the end of 1971, Thompson & Green charged its receivables from Gregory to its bad debt reserve account as worthless, and its computation of its addition to the bad debt reserve and hence the bad debt deduction claimed on its 1971 return were based largely upon this charge-off of the Gregory debt. 3In 1971, Thompson & Green used the "Black Motor" formula for computing its deduction for an addition to its bad debt reserve. 4 Thompson & Green's year-end accounts receivable, and debts*709 charged to the reserve, and bad debt recoveries for 1971 and for the five prior years were as follows: WITH GREGORY DEBTBalance of A/RBad debtsBad debtsYearat end of yearcharged offrecovered1966$ 1,590,985.27$ 9,073.29$ 44,216.0019671,370,049.5313,495.6946,664.7619682,979,449.8816,151.1430,816.7019693,174,649.5728,318.9221,249.1419703,386,179.268,069.045,626.7819713,616,895.92460,905.992,235.096-yr.Total$16,118,209.43$536,014.07$150,808.476-yr.Average$ 2,686,368.24$ 89,335.68$ 25,134.75Of the $460,905.99 that petitioner charged off in 1971, the amount of $405,704.12 represented the disputed Gregory debt. Without the Gregory debt, the bad*710 debts charged off in 1971 would amount to only $55,201.87, which would mean that the total of all debts charged off over the six-year period would be less than the total of bad debts recovered over the same period.5 In his notice of deficiency, respondent determined that the disputed Gregory debt was not worthless in 1971 and accordingly redetermined Thompson & Green's addition to its bad debt reserve and hence its bad debt deduction to reflect that determination. 6*711 On September 14, 1973, Chancellor Drowota of the Chancery Court at Nashville, Tennessee, determined that USF&G was liable on its bond to Thompson & Green for Gregory's unpaid machine rentals and that Gregory was liable for both unpaid machine rentals and for services, parts, and repairs rendered during the terms of the leases. He also determined that Gregory had no equity in the machines and thus dismissed Gregory's counterclaim against Thompson & Green. The Chancellor then referred the case to a Master to determine damages, i.e. the amount of Thompson & Green's provable claims for the various items. The Chancellor noted that it was still incumbent on Thompson & Green to prove, as in any ordinary action for debt, the existence and amount of the debt sued on. After the Special Master issued his report on May 28, 1974, Thompson & Green, Gregory, and USF&G, each through its attorneys, took various exceptions to that report. The Chancellor subsequently modified the Master's report in certain respects. *712 Pursuant to the Special Master's report, as modified, the Chancellor on April 4, 1975, entered judgment for Thompson & Green against USF&G in the sum of $273,753.84 for unpaid machine rentals and against James T. Gregory, Inc., in the sum of $403,482.23, plus interest at the legal rate from November 20, 1973, until paid, for the unpaid machine rentals and in the sum of $9,884.29, plus interest from April 8, 1971, for unpaid parts and repair services. USF&G's petition for rehearing and motion for a new trial were apparently denied.USF&G then appealed. Only the surety, USF&G, appealed the Chancellor's decree. On August 6, 1976, the Court of Appeals for the Western Section of Tennessee (sitting at Nashville) reduced the judgment against USF&G to $202,682.25, and affirmed the Chancellor's decree as so modified. The reason for the reduction was that Thompson & Green had applied $71,071.59 of payments from Gregory to the parts and service account instead of to the machine account and USF&G contended, and the Court of Appeals agreed, that all payments should be applied to the machine account on which USF&G was liable on its bond. USF&G's suretyship liability did not extend to the parts*713 and service account, and the Court of Appeals held that USF&G was entitled to a credit for the amount of $71,071.59 that Thompson & Green received from Gregory and applied to reduce the balance of the parts and service account rather than the machine account. Both Thompson & Green and USF&G filed petitions for certiorari to the Supreme Court of Tennessee, but only the surety's petition was granted. On March 29, 1978, the Supreme Court of Tennessee affirmed the judgment of the Court of Appeals. United States Fidelity and Guaranty Company v. Thompson & Green Machinery Co., Inc.,568 S.W. 2d 821 (1978). As affirmed by the Supreme Court, Thompson & Green's judgment against USF&G was for $202,682.25, plus interest. After payment of its attorneys' fees, Thompson & Green recovered approximately $132,500 (plus statutory interest) in 1978. B. 1976In the years 1974 through 1976, Thompson & Green's tax returns reflected an increase in year-end trade notes and accounts receivable as a percentage of total sales as follows: Year-End TradeTrade Notes andNotes and AccountsAccounts ReceivableReceivable asYearSales on Accountat Year-EndPercentage of Sales1974$29,823,071$2,324,0117.79%197529,682,1385,941,62420.01%197627,354,9688,240,44430.12%*714 In 1976, Thompson & Green changed its method of computing its bad debt reserve. Prior to 1976, Thompson & Green had used the "Black Motor" formula for computing its reserve. In 1976 Thompson & Green abandoned the Black Motor formula and instead determined its bad debt reserve by a specific analysis of delinquent accounts that it believed were doubtful. In making this specific analysis, Charles Cherry, Thompson & Green's assistant credit manager in 1976, identified 16 specific doubtful accounts receivable from a schedule of accounts more than 90 days delinquent, as follows: Amount collectedBalancein cash as ofAccount12-31-76TrialAmerican Recycle$ 31,946.33$20,000.00Carlon8,531.797,531.49Delta Const. Co.5,173.34Not collectedGregory29,861.2529,861.25Haley Contractors220,136.1712,500.00T. K. Jessup30,041.50Not collectedJohnson Const. Co.8,624.28Not collectedCurtis Knott5,086.364,086.36Savannah Ready Mix3,615.393,615.39Site Preparation, Inc.172,026.86Not collectedSite Preparation of Knoxville11,163.19RepossessedSouthland Const.329,298.43Not collectedStites Const. Co.9,177.229,177.22VanBuren Mining47,229.58Not collectedWoodlawn Mem. Park5,196.935,196.93James H. Wright4,824.314,824.31TOTAL:$921,932.93$96,792.95*715 The total of accounts receivable that the credit manager considered to be more than 90 days delinquent at the end of 1976 was $1,050,665.99. Thompson & Green determined that 16 of these accounts were of doubtful collectability for several reasons. First some of them were accounts of small coal companies to which Thompson & Green had extended credit and those companies were then suffering from a weak coal market. Other of the accounts were customers who were new and inexperienced in their businesses. Others had had recent management changes through acquisitions or through the death or illness of principal owners. Finally, one customer had received excessive credit from an overly-cooperative sales manager at Thompson & Green who had a long-standing personal relationship with the debtor's principal owners. On the basis of these specific "doubtful" accounts, Thompson & Green computed its addition to bad debt reserve and thus its bad debt deduction. These 16 accounts were not charged to the bad debt reserve in 1976 but were merely used to calculate the amount of the necessary reserve. Moreover, it appears that Thompson & Green charged some of these debts off to the reserve in*716 later years. The sum of $96,782.95 shown in Thompson & Green's analysis above as total cash collections is neither complete nor wholly accurate. Some of the 16 accounts involved leases or sales of machinery that Thompson & Green repossessed when the payments were not made. Thompson & Green's practice was to chancel the entire indebtedness upon the repossession of the machinery, and then to credit the amount of the indebtedness to the inventory account attributable to the repossessed machinery. Thompson & Green would then ultimately report gain or loss when the repossessed machinery was resold. Because of this, it is not possible to determine how much of the $921,932.93 in doubtful accounts was actually collected. Some of those amounts were collected, some were written off in later years, and some remained on Thompson & Green's books at the time of the trial. The record does not establish that any of these 16 debts became wholly or partially worthless in 1976. Rather than charging off any of these debts as wholly or partially worthless in 1976, Thompson & Green apparently created something in the nature of a contingency fund for some $700,000 of what it considered to be doubtful*717 debts and added the amount of that fund to its bad debt reserve, a system that it described as "reserving" those debts, but did not write off or charge off those debts to its bad debt reserve. Using the changed method of determining its addition to its bad debt, described above, Thompson & Green claimed an addition to its bad debt reserve for 1976 in the amount of $808,898.81 and deducted that amount on its 1976 Federal corporate income tax return.Respondent determined that the addition to its bad debt reserve that Thompson & Green reported on its 1976 return was unreasonable. Respondent redetermined Thompson & Green's addition to its bad debt return using the Black Motor formula as an amount of $100,629.28, and consequently disallowed $708,269.53 of the $808,898.81 that Thompson and Green had claimed.7 In making his recomputation, respondent did not allow any of the disputed Gregory debt of $405,704.12 as a charge-off to the bad debt reserve for any of the six years (1971-1976) used in making the Black Motor formula computation. 8*718 II. Interest from Governmental UnitsThompson & Green sold equipment to various subdivisions of the State of Tennessee under lease-purchase agreements evidenced by a purchase order, a lease agreement (on an "Associated Equipment Dealers Uniform Lease Contract" form) and a bill of sale. At the beginning of each transaction Thompson & Green executed a purchase order specifying the total purchase price of the equipment, the trade-in allowance for used equipment delivered to Thompson & Green in exchange, the monthly payment, the minimum number of monthly payments and the interest rate (generally six percent) to be applied to the outstanding balance.Thompson & Green would deliver the new equipment in exchange for used equipment given in trade and proceed to bill the governmental units for monthly payments. Thompson & Green applied all amounts it received to the net purchase price stated on the original purchase order. When the total of all monthly payments had been applied to reduce the net purchase price to zero, Thompson & Green then billed the governmental units for the interest accrued on the declining principal balance after delivery of the machine. The final invoice (stating*719 the total interest charged) constituted the bill of sale for the equipment and evidenced the county's ownership.For each of the transactions in question, the governmental units actually paid the interest charge and received the equipment. Thompson & Green introduced the contract documents relating to eight of these transactions, which the parties have stipulated to be representative of all the transactions in question. The transactions are as follows: Date onDate onMinimum RentalPurchaserPurchase OrderLeaseTermBedford County Highway Dept.4-14-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 monthsMacon County Highway Dept.9-06-669-13-661 monthMacon County Highway Dept.10-01-6310-04-631 monthPickett County Highway Dept.3-04-691 monthDickson County Highway Dept.8-25-698-22-691 monthLewis County Highway Dept.7-07-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 monthCity of Shelbyville1-21-66Warren County Highway Dept.12-14-656 monthsThompson & Green handled lease-purchase agreements with customers other than governmental subdivisions in the same fashion except that the interest rate charged was different. Thompson & Green carried two interest accounts on*720 its books, one for interest from commercial customers and one labeled "non-taxable interest" for the interest from governmental customers. The governmental purchasers entering into the lease-purchase agreements with Thompson & Green were not obligated to pay any interest. Under the terms of the agreements, the governmental purchasers could simply return the equipment at the end of the minimum lease period or thereafter, with no further obligation to pay anything. To governmental purchasers, however, would forfeit any trade-in they had made and forfeit the opportunity to have their rental payments applied against the total purchase price of the piece of equipment being rented. Contracting agents for two of the governmental customers testified at trial--a Preston Gilmore, who had been superintendent of the Dickson County Highway Department, and a Finley Brown, who was Commissioner for the Lewis County Highway Department. Gilmore and Brown neither personally sought nor expressly obtained authority from their respective County Quarterly Courts (County Commissioners) to obligate the counties to pay interest to Thompson & Green. The use of the lease-purchase form to sell equipment*721 to governments was common practice in Tennessee.Both Gilmore and Brown believed that they had authority to enter into the lease-purchase agreements, and the authority to pay interest at the end of the contracts to effect the transfer of ownership of the equipment to the counties. Thompson & Green recorded its interest income from these lease-purchase contracts with the governmental customers on its books as tax-exempt interest and consequently did not report any of the interest on its returns for the years in question. In his notice of deficiency, respondent determined that interest in the amount of $13,827, $1,527.04, and $6,642.87 for the years 1971, 1973, and 1976, respectively, was not tax exempt and should have been included in Thompson & Green's taxable income. III. Travel and Entertainment Expenses/Constructive Dividends The Grand Cayman TripIn January of 1973 Thompson, DeWitt C. Thompson, IV (Dee), and Thompson & Green's used equipment manager, Warren Lawrence, accompanied various employees and principals of CFW Construction Company (Lewis Carter, Bill Carter, Doug Murray, and Herb Stevenson) on a trip to Florida and the Grand Cayman Islands.Thompson & Green's*722 company airplane was used for the trip.CFW was a substantial customer of Thompson & Green. John Stevenson, Thompson & Green's salesman assigned to the CFW account, asked Lawrence to go in his place on the trip because Lawrence was used equipment manager and had at one time worked for CFW and knew all the people involved. Approximately one month after the trip, Thompson & Green shipped to CFW a Caterpillar Model 983, Traxcavator costing $80,831. 9 Lawrence may have discussed the sale of the Traxcavator with officials of CFW on the trip, but the negotiations were conducted for Thompson & Green by the salesman, John Stevenson. The record does not establish exactly when this sale was negotiated. See footnote 9. On the trip, the persons from Thompson & Green and CFW mainly tried to do some fishing off of Fort Lauderdale and then went scuba diving off of the Cayman Islands. *723 The Kelley Tractor TripIn February of 1973, Thompson & Green's industrial manager, Bill Smith, accompanied Mr. Cortner and Mr. Hampson of Cortner, Hampson & Associates on a trip to the Kelly Tractor Company in Miami, Florida. The Thompson & Green company plane was used for that trip. Cortner, Hampson & Associates were consulting engineers. Smith had arranged the trip to discuss Caterpillar standby generator equipment with people at Kelly Tractor, who had a great deal of experience in the field. The purpose of the trip was to convince Cortner and Hampson to write design specifications that would permit Thompson & Green to bid competitively for contracts requiring standby generator equipment. The Caterpillar equipment that Thompson & Green sold was of higher quality and generally more expensive than other available equipment, which often made it impossible for Thompson & Green to successfully bid where design specifications permitted equipment of substantially lesser quality. The Panama TripIn February of 1973, Thompson accompanied Bill Carter, Lewis Carter, and Fred Young (and perhaps others) of CFW Construction Company on a trip to Panama City, Panama, and San*724 Jose, Costa Rica. The company airplane was used for this trip. On this trip they went deep-sea fishing. CFW was a long-standing and substantial customer of Thompson & Green. Thompson had been conducting business primarily with Bill Carter, who had started the company in the early 1950's. By 1973, CFW had promoted an executive named Fred Young to be president, and Thompson believed that Young was not as willing to do business with Thompson & Green as Carter had been and that this reluctance was caused by personal difficulties between Thompson and Young. The purpose of the deep-sea fishing trip was for Thompson to develop a better personal relationship with Young in order to convince Young to continue doing business with Thompson & Green. Thompson believed that the trip was successful, at least at first. 10*725 The Hoover TripIn March of 1973, Thompson accompanied Mr. E. Hoover, the principal owner of Hoover, Inc., on a trip to Key West, Florida. The Thompson & Green company plane was used for that trip. Hoover, Inc., was a multi-million dollar company and a substantial customer of Thompson & Green, occupying 25 percent of Thompson's business time. The purpose of the trip was to allow Hoover to look at property in Florida that he was considering purchasing and developing. Although Hoover did not undertake the project, Thompson believed that Thompson & Green would have sold Hoover the equipment needed for the job had Hoover gone ahead with the project. The Mexico TripIn April of 1973, Thompson, DeWitt C. Thompson, IV, and their wives, and Jack Oman, Stewart Oman, and their wives, went on a trip to Cozumel, Mexico. The company plane was used for this trip. Jack and Stewart Oman were principals in the Oman Construction Company (Oman), a multi-national corporation with offices in Nashville. Oman was Thompson & Green's largest account. Thompson had originally been responsible for the Oman account but in the late 1960's he turned over much of the responsibility to an employee*726 named Bill Cate. Cate was very successful in his dealings with Oman for Thompson & Green. At the time of the trip, Cate had left Thompson & Green to form a competing business. Thompson & Green attempted to replace Cate on the Oman account with DeWitt C. Thompson, IV (Dee), Thompson's son, but had been unsuccessful.Thompson was concerned that the Omans would take their business to Cate. The purpose of the trip to Mexico was to permit Dee to become better acquainted with the Omans, to allow him to solidify his personal relationship with them, and to convince the Omans to continue doing business with Thompson & Green.The reason that the wives were on the trip was that Thompson believed the Omans would not have gone on the trip without their wives, and since the Oman wives would be along, Thompson thought it appropriate that his wife and Dee's wife also accompany them. Thompson believed that the trip was successful, permitting Dee to establish himself with the Omans. The Oman Construction Company remains Thompson & Green's largest customer. For these five trips, Thompson & Green incurred and paid the following expenses: AirplaneTravel &TripDatesExpensesEntertainmentTotalGrand Cayman1-11 to$1,120.30$669.35$1,789.651-14-73Kelly Tractor2-01 to(Miami, Fla.)2-04-73627.30627.30Panama2-16 to2-28-731,621.805,585.357,207.15Hoover(Key West, Fla.)3-15-73722.50722.50Mexico4-15 to4-19-73785.401,826.002,611.40*727 Thompson & Green also prepaid in 1972 an amount of $1,200 in connection with the Panama trip. Thompson & Green maintained an airplane log that reflected the above airplane expenses, but which did not reflect the business purpose of any trips except for noting the Tennessee Road Builders' Association Convention on February 28, 1973, with a cryptic "TRBA." The passengers on various flights were identified only as "CFW," "Carter & Group," "Jack Oman & Party," and similar notations, which neither identified the specific individuals nor their business relationship with Thompson & Green. On its 1973 return, Thompson & Green claimed as deductions the expenses of these five trips, totalling $12,958. In his notice of deficiency to Thompson & Green, respondent disallowed these claimed deductions on the ground that they were not ordinary and necessary business expenses under section 162, and that Thompson & Green had failed to substantiate the expenses under section 274. In addition, respondent in his notice of deficiency to Thompson determined that Thompson & Green's payment of the expenses of the Panama trip and the Mexico trip were constructive dividends to Thompson in the amount of*728 $1,200 in 1972 and $9,818.55 in 1973. OPINION I. Bad Debt DeductionsIn lieu of the deduction provided by section 166(a) for specific debts that become wholly or partially worthless within the taxable year, section 166(c) allows "(in the discretion of the Secretary) a deduction for a reasonable addition to a reserve for bad debts." (Emphasis added.) Petitioner Thompson & Green used the reserve method of accounting for its bad debts. A had debt reserve serves as an estimate of the losses that can reasonably be expected to result from the debts outstanding at the close of the taxable year. Handelman v. Commissioner,36 T.C. 560, 565 (1961). "Under the reserve method for handling bad debts, the reserve is reduced by charging against it specific debts which become worthless during the taxable year and is increased by crediting it with additions which are reasonable within the meaning of section 166(c)." Roanoke Vending Exchange, Inc. v. Commissioner,40 T.C. 735, 740 (1963). The ultimate question is "whether the balance in the reserve at the end of the year is adequate to cover the expected worthlessness on outstanding debts and not*729 whether the proposed addition is sufficient to absorb the estimated losses," and if the reserve is already adequate no addition to the reserve need be allowed and hence no deduction need be allowed. 40 T.C. at 740. See also Massachusetts Business Development Corp. v. Commissioner,52 T.C. 946, 952 (1969); Petaluma Co-Operative Creamery v. Commissioner,52 T.C. 457, 467 (1969). 11 Generally, the deduction for additions to the reserve will at least equal the amounts of debts properly charged to the reserve as worthless minus recoveries of debts previously charged to the reserve. See Roth Steel Tube Co. v. Commissioner,620 F. 2d 1176, 1179 (6th Cir. 1980), affg. 68 T.C. 213 (1977). However, when the reserve balance is adequate to cover the net debts charged off as worthless during the taxable year (perhaps because of a history of writing off debts too rapidly or usually large recoveries during the taxable year) and to cover year-end outstanding debts likely to become worthless, no addition for the taxable year will be allowed. James A. Messer Co. v. Commissioner,57 T.C. 848, 864 (1972);*730 Massachusetts Business Development Corp. v. Commissioner,supra,52 T.C. at 952; Roanoke Vending Exchange, Inc. v. Commissioner,supra,40 T.C. at 740. Because of the discretion expressly granted to respondent by section 166(c), a taxpayer must prove not only that his claimed additions are reasonable, but also that respondent's redetermination of the taxpayer's allowable bad debt reserve (and thus the taxpayer's allowable deduction for additions to the reserve) was so unreasonable and arbitrary as to amount to an abuse of that statutory discretion. Thor Power Tool Co. v. Commissioner,439 U.S. 522, 547-549 (1979); Roth Steel Tube Co. v. Commissioner,68 T.C. 213, 219 (1977), affd. 620 F. 2d 1176, 1179 (6th Cir. 1980); Roanoke Vending Exchange, Inc. v. Commissioner,supra,40 T.C. at 741; Krim-Ko Corp. v. Commissioner,16 T.C. 31, 37 (1951). Respondent's regulation under section 166(c) emphasizes the factual nature of the inquiry, providing as follows: Sec. 1.166-4.RESERVE*731 FOR BAD DEBTS. (b) Reasonableness of Addition to Reserve.-- (1) Relevant Factors.--What constitutes a reasonable addition to a reserve for bad debts shall be determined in light of the facts existing at the close of the taxable year of the proposed addition. The reasonableness of the addition will vary as between classes of businesses and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve.Thus, petitioner Thompson & Green has a heavy burden and the issue is essentially a factual one. Sec. 1.166-4(b)(1), Income Tax Regs.; Roanoke Vending Exchange, Inc. v. Commissioner,supra,40 T.C. at 742; Apex Brewing Co. v. Commissioner,40 B.T.A. 1110, 1119-1120 (1939). Moreover, even if the taxpayer carries its burden of establishing that its addition was reasonable, that fact does not automatically establish that respondent's determination was unreasonable or an abuse of discretion. Roth Steel Tube Co. v. Commissioner,supra,620 F. 2d at 1179-1180;*732 Paramount Finance Co. v. United States,157 Ct. Cl. 824, 304 F. 2d 460, 464 (1962).A. 1971 DeductionIn computing its deduction for additions to its bad debt reserve for 1971, Thompson & Green used the formula of Black Motor Co. v. Commissioner,41 B.T.A. 300 (1940), affd. on other grounds, 125 F. 2d 977 (6th Cir. 1942). This is a formula long approved by this and other courts. Thor Power Tool Co. v. Commissioner,supra,439 U.S. at 548-549. In making its computation under the Black Motor formula, Thompson & Green charged off to its bad debt reserve the entire $405,704.12 Gregory debt. In his redetermination of Thompson & Green's allowable addition to its bad debt reserve for 1971, respondent also used the Black Motor formula, but did not allow any of the Gregory debt of $405,704.12 to be charged to the reserve. See footnote 6 for the parties' respective computations.There is no dispute as to the parties' computations except for the treatment of the Gregory debt. As part of its burden of overcoming respondent's determination, Thompson & Green must first prove that its claimed addition was reasonable. *733 To carry this part of its burden, Thompson & Green must prove that the Gregory debt of $405,704.12 that it charged to its reserve was wholly or partially worthless in 1971. 12 A debt may not be charged against the reserve until it has become worthless, wholly or partially, and the test of worthlessness for purposes of a charge against the bad debt reserve is the same as that for worthlessness under the specific charge-off method of section 166(a). Roth Steel Tube Co. v. Commissioner,620 F. 2d 1176, 1180 (6th Cir. 1980), affg. 68 T.C. 213, 222 n. 6 (1977); Paramount Liquor Co. v. Commissioner,242 F. 2d 249 258-259 (8th Cir. 1957), affg. a Memorandum Opinion of this Court. 13*734 Thompson & Green makes several arguments to support its position that the Gregory debt was worthless, wholly or partially, in 1971. However, in 1971 Thompson & Green brought suit against both Gregory and Gregory's surety, USF&G, on that debt, and at the end of 1971 that lawsuit was still pending and was not concluded until 1978. The details of that protracted litigation are set out in the findings of fact and will not be repeated here.Suffice it to say, we do not regard the suit against Gregory as a mere technicality under Tennesses suretyship law, as Thompson & Green treats it. In view of Gregory's counterclaim against Thompson & Green and its participation in the lawsuit through its own attorney, we think that not only the worthlessness of the debt but even the existence of and amount of Gregory's indebtedness were in dispute at least until the Chancellor entered his decree against Gregory in 1975, a decree from which Gregory did not take an appeal. However, since Thompson & Green has concentrated its attention on the claim against the surety, we will do the same and address the various arguments advanced. Citing Zeeman v. United States,275 F. Supp. 235 (S.D.N.Y. 1967)*735 and Rev. Rul. 80-24, 1980-1 C.B. 47, Thompson & Green argues that its claim against USF&G was separate and independent of the Gregory debt, and therefore its claim against the surety had no bearing upon the issue of the worthlessness of the Gregory debt. We do not agree. Zeeman held that the pendency of various lawsuits for fraud against certain individuals, persons who allegedly were responsible for falsifying warehouse receipts and export orders securing the debt owing to the taxpayer, did not affect the determination of the worthlessness of the underlying debt for purposes of section 166. Likewise, Rev. Rul. 80-24, supra, held that the taxpayer's pending action under the Securities Act of 1933 and the Securities Exchange Act of 1934 against the party, who had sold taxpayer a promissory note later dishonored by the maker and discharged in bankruptcy, did not affect the determination of the worthlessness of the promissory note. As the court stated in Zeeman,275 F. Supp. at 251: None of these suits seems to deal with the debt owed by Allied [the debtor] to Haupt [the partnership of which the taxpayer was a limited partner], *736 or with collateral, guarantees or indemnity contracts directly related to the debt as such. Although they deal with the transactions which caused the debt to become worthless, and the damages claimed may be measured by the amount of the bad debt loss, recovery in these actions would not be recovery on the debt, and, therefore, the pendency of the suits does not affect the deductibility of the bad debt loss for 1963 by Haupt. (Emphasis added.) Here, however, Thompson & Green's rights against USF&G, the surety, were "directly related to the [Gregory] debt as such." Tennessee law requires highway contractors to obtain surety bonds "for the full and faithful performance of every part and stipulation of the contract, especially the payment for all materials purchased and for all labor employed in the contemplated work." Tenn. Code Ann. § 54-5-119 (1980), formerly Tenn. Code. Ann. § 54-519 as in effect in 1971. (Emphasis supplied.) USF&G furnished the suretyship bond for Gregory's highway contracts, and Thompson & Green, as one of Gregory's suppliers, was a third-party beneficiary of that suretyship contract. Such surety bonds take the*737 place of mechanics' and materialmen's liens, to protect the laborers' and suppliers' rights to payment for work and materials furnished on highway projects. 17 Am. Jur. 2d, Contractors' Bonds, sec. 44 (1964). 14 Thus, the requirement of a surety bond is essentially statutory security for a contractor's payment of its debts to its laborers and suppliers. The rights of a suppler like Thompson & Green under such a surety bond are directly related to the underlying debt. Hence, we cannot ignore Thompson & Green's rights against the surety in ascertaining the worthlessness of the Gregory debt. A secured debt is not worthless until the security itself becomes worthless. See sec. 1.166-2(a), Income Tax. Regs.15 This is true whether the security takes the form of a guarantee, collateral, or, as here, *738 a statutory surety bond. 16 See generally 5 Mertens, Law of Federal Income Taxation, secs. 30.50 and 30.52 (1980 rev. ed.). Consequently, to prove that the Gregory debt was wholly or partially worthless, Thompson & Green must establish that its rights against the surety, USF&G, were wholly or partially worthless in 1971. The worthlessness of a debt is a factual question to be determined from all the circumstances, and to prove worthlessness, Thompson & Green must point to "indentifiable events which form the basis of reasonable grounds for abandoning any hope…" of future recovery of the debt. Dallmeyer v. Commissioner,14 T.C. 1282, 1291-1292 (1950). See Denver & Rio Grande Western Railroad Co. v. Commissioner,279 F. 2d 368, 375 (10th Cir. 1960), affg. 32 T.C. 40 (1959); James A. Messer Co. v. Commissioner,supra,57 T.C. at 861. *739 Thompson & Green argues that its rights against the surety, USF&G, were wholly worthless in 1971, pointing to what it regards as: (1) the insolvency and liquidation of Gregory; (2) the refusal of USF&G to pay Thompson & Green's claim, even after paying all other claims; and (3) the unlikelihood of its recovery on its suit against USF&G. Although hardly conclusive, the fact that Thompson & Green maintained a lawsuit against Gregory and USF&G to collect on the Gregory debt strongly indicates to us that Thompson & Green did not consider its claim to be worthless. See Kugel v. Ryan,289 F. 2d 329, 331 (2d Cir. 1961); Scofield's Estate v. Commissioner,266 F. 2d 154, 159 (6th Cir. 1959), affg. 25 T.C. 774 (1956). 17 Cf. Boehm v. Commissioner,326 U.S. 287 (1945), affg. 146 F. 2d 553 (2d Cir. 1945), affg. a Memorandum Opinion of this Court dated October 23, 1943. Finally, while the determination of worthlessness must be made on the basis of the facts and circumstances existing at the time, the reasonableness of that determination may be supported or rebutted by subsequent events. Crown v. Commissioner,77 T.C. 582, 600 (1981);*740 New York Water Service Corp. v. Commissioner,12 T.C. 780, 788 (1949). See also Minneapolis, St. Paul & Sault Ste. Marie Railroad Co. v. United States,164 Ct. Cl. 226, 13 AFTR 2d 472, 64-1 USTC P9213 (1964); 5 Mertens, Law of Federal Income Taxation, sec. 30.37 (1980 rev. ed.).Here, Thompson & Green obtained judgments against Gregory and USF&G in 1975 and ultimately recovered about one-half of the debt from USF&G in 1978. Consequently, upon this record, we cannot conclude that as of 1971 Thompson & Green reasonably abandoned all hope of future recovery on the Gregory debt. See Dorminey v. Commissioner,26 T.C. 940, 946-947 (1956); Sitterding v. Commissioner,20 T.C. 130, 136 (1953). Thompson & Green has failed to prove that the debt from Gregory and/or its rights against USF&G became wholly worthless in 1971. Alternatively, Thompson & Green argues that even if the debt was not wholly worthless,*741 it was partially worthless in 1971, and consequently properly charged to its bad debt reserve to the extent of that partial worthlessness. This would of course affect the calculation of a reasonable reserve for the year under the Black Motor formula. 18*742 As noted above, the test of partial worthlessness for a charge-off to reserve is the same as that for a deduction under the specific charge-off method. Roth Steel Tube Co. v. Commissioner,supra,620 F. 2d at 1180. Section 166(a)(2), dealing with partially worthless debts, provides as follows: When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. Thus, the Commissioner has "some measure" of discretion in determining whether a debt is partially worthless. Mayer Tank Manufacturing Co. v. Commissioner,126 F. 2d 588 (2d Cir. 1942), affg. a Memorandum Opinion of the Board of Tax Appeals; Portland Manufacturing Co. v. Commissioner,56 T.C. 58, 72 (1971), affd. in an unpublished opinion (9th Cir. 1975); Findley v. Commissioner,25 T.C. 311, 318 (1955), affd. per curiam 236 F. 2d 959 (3d Cir. 1956). To overcome respondent's determination, a taxpayer must show that respondent acted so unreasonably or arbitrarily as to amount to an abuse of his discretion. Olympia Harbor Lumber Co. v. Commissioner,79 F. 2d 394, 396 (9th Cir. 1935),*743 affg. 30 B.T.A. 114 (1934); Stranahan v. Commissioner,42 F. 2d 729, 732 (6th Cir. 1930), affg. 14 B.T.A. 1405 (1929), cert. denied 283 U.S. 822 (1931); Portland Manufacturing Co. v. Commissioner,supra,56 T.C. at 73; Findley v. Commissioner,25 T.C. at 318.However, as we stated in Portland Manufacturing Co.,supra,56 T.C. at 73: [T]he Commissioner's discretion over the question of partial worthlessness is not absolute and must be based upon reason. Estate of Harris Fahnestock,2 T.C. 756, 759 (1943). Accordingly, we do not think that respondent can ignore the soundly exercised business judgment of [the taxpayer's] officers. The courts have long given weight to such judgment in cases involving the determination of total worthlessness under section 166(a)(1) or its predecessor. Minneapolis, St. Paul Railroad Co., et al.,164 Ct. Cl. 226, 241 (1964); Raffold Process Corp. v. Commissioner,153 F. 2d 168, 171 (C.A. 1, 1946). We see no reason why such judgment should not also be relevant in evaluating the reasonableness*744 of the respondent's exercise of the discretion accorded him under section 166(a)(2). Thus, even though the taxpayer has a heavier burden under section 166(a)(2) than under section 166(a)(1), if the business judgment is coupled with facts which clearly establish the sagacity of such judgment, then it must be held that respondent did not reasonably exercise his discretion. Clark v. Commissioner,85 F. 2d 622 (C.A. 3, 1936). See also George E. Warren Corp. v. United States,135 Ct. Cl. 305, 141 F. Supp. 935, 940 (1956), where the court said: "[Respondent] cannot arbitrarily refuse a deduction when the facts clearly show that the debt is partially worthless and the extent thereof." Section 166(a)(2) allows a deduction only to the extent that the debt is "charged off" within the taxable year. "The purpose of the charge-off, in the case of a debt claimed to have become worthless in part, is to perpetuate evidence of taxpayer's election to abandon part of the debt as an asset (Cf. Hamlen v. Welch,116 F. 2d 413)--a procedure which is unnecessary in the case of wholly worthless debts, where total worthlessness is the sole test." *745 Findley v. Commissioner,supra,25 T.C. at 319. However, where the taxpayer originally claims the debt as wholly worthless, and then properly raises the issue of partial worthlessness before this Court, as Thompson & Green has done by its amended petition, the taxpayer's failure to charge-off a specific amount as partially worthless does not preclude a deduction for partial worthlessness, if he carries his burden of proof to show such partial worthlessness. Simmons v. Commissioner,4 T.C. 478, 484-486 (1944); First National Corporation of Portland v. Commissioner,2 T.C. 549, 563-564 (1943), revd. on another issue, 147 F. 2d 462 (9th Cir. 1945). Thompson & Green of course charged off the entire debt of $405,704.12 as worthless, so we can determine whether or not some part of that debt was worthless and, if so, whether or not disallowance of a deduction for that portion would amount to an abuse of discretion. To prove that a debt became partially worthless within a taxable year, the taxpayer must show with reasonable certainty that a specific, ascertainable portion of the debt was no longer collectable. Wilson Bros. & Co. v. Commissioner,124 F. 2d 606, 610 (9th Cir. 1941),*746 affg. a Memorandum Opinion of the Board of Tax Appeals; Sika Chemical Corp. v. Commissioner,64 T.C. 856, 863 (1975); Bullock v. Commissioner,26 T.C. 276, 299 (1956), affd. per curiam 253 F. 2d 715 (2d Cir. 1958); First National Bank of Los Angeles v. Commissioner,6 B.T.A. 850, 860 (1927). While subsequent events may be shown to support the taxpayer's initial determination of partial worthlessness, Clark v. Commissioner,85 F. 2d 622, 625 (3d Cir. 1936), revg. a Memorandum Opinion of the Board of Tax Appeals dated December 5, 1936, ultimate proof of partial worthlessness depends upon the facts and circumstances as they existed at the time the debt is claimed to have become worthless. Brimberry v. Commissioner,588 F. 2d 975 (5th Cir. 1979), affg. a Memorandum Opinion of this Court; Bullock v. Commissioner,supra,26 T.C. at 299. It is especially important to focus upon the facts existing at the time the debt is claimed to have become partially worthless where, as here, the taxpayer is seeking to prove partial worthlessness as an alternative to its initial position*747 of total worthlessness. Thompson & Green first argues that 30 percent of the total debt was clearly worthless by 1971. Thompson & Green says that by agreeing to pay its attorneys 30 percent of the total recovery, its maximum net recovery was fixed at 70 percent of the total Gregory debt, and that the other 30 percent was forever lost. We do not agree. Thompson & Green's fee arrangement with its attorneys is not an appropriate measure of the worthlessness of the debt. 19 A contingent obligation for attorney's fees is not a bad debt. Attorney's fees do not reduce the taxpayer's recovery in a lawsuit but rather, to the extent the statutory requirements are met, may be deductible expenses. See Petersen v. Commissioner,38 T.C. 137, 151-152 (1962). *748 Thompson & Green makes another argument for partial worthlessness in regard to the parts and service account. Respondent allowed the charge-off of a debt from Gregory to Thompson & Green in the amount of $10,572.03 reflected in Thompson & Green's "parts and service" account. That amount is not in dispute in this case. In the litigation against Gregory and USF&G, the Tennessee Court of Appeals determined in 1976 (and was affirmed on this point by the Tennessee Supreme Court in 1978) that $71.071.59 that Gregory had paid to Thompson & Green and that Thompson & Green had applied to the parts and service account, was money from bonded highway projects and thus should have been credited against USF&G's liability on the machine account. USF&G was liable under its bonds only for the machine rental expenses. Accordingly, the courts gave USF&G a credit for these payments, reducing the judgment against USF&G for these payments to Thompson & Green by Gregory. Thompson & Green argues that because of this, the "true" balance in the parts and service account at the end of 1971 was $81,643.62 and the "true" balance of the machine account was $334,632.53 ($405,704.12 - $71,071.59), and that*749 since respondent allowed Thompson & Green to charge off $10,572.03 initially shown on the parts and service account, "Respondent has not contested the worthlessness of the parts and service account, but has erroneously failed to acknowledge the correct amount of the account as determined by the Tennessee Supreme Court." Thompson & Green thus seems to argue that this "corrected" balance in the parts and service account is an accurate and adequate measure of partial worthlessness in 1971. Again we do not agree. 20*750 In its lawsuit, Thompson & Green sought to recover the entire $405,704.12 balance reflected in its machine rental account from both Gregory and USF&G. However, its claim on the parts and service account was made only against Gregory. In his report, the Special Master noted that fact, and the Chancellor in his decree of April 4, 1975, entered judgment for the parts and service account against Gregory only, and with interest on the amount determined ($9,884.29) to run from April 8, 1971, since Gregory had never contested its liability on the parts and service account. The Tennessee Court of Appeals later determined in 1976 that USF&G was entitled to a credit for an amount of $71,071.59, an amount that Gregory had paid to Thompson & Green and that Thompson & Green had applied to reduce the parts and service account. While the surety, USF&G, may have been entitled to have all payments connected with the bonded highway work applied to reduce its liability under its bond, we cannot view the sparse record before us as establishing a "correct" or "true" balance in the parts and service account as of 1971, as Thompson & Green now contends. It does not appear that the judgment against*751 Gregory for machine rentals in the amount of $403,482.23 was ever reduced.After the Tennessee Court of Appeals ruled that USF&G was entitled to that credit of $71,071.59, Thompson & Green petitioned for certiorari to the Tennessee Supreme Court to contest that termination. The Tennessee Supreme Court denied Thompson & Green's petition for certiorari on that issue. Thus, up until the time the Tennessee Supreme Court denied its petition for certiorari (a date not shown by the record in this case), Thompson & Green was really arguing that an amount of $71,071.59 had already been properly paid on parts and services, not that it was a debt that became worthless in 1971. Thompson & Green was still trying to recover this amoung of $71,071.59 from USF&G up to the time the Tennessee Supreme Court denied its petition for certiorari. That fact belies any belated claim of partial worthlessness in 1971 or at any time before the Tennessee Supreme Court acted on the petition for certiorari. Finally, Thompson & Green argues that partial worthlessness may be measured by the eventual result of the litigation. It argues that since the Court ultimately determined that USF&G was liable only for*752 $202,682.25, and that since the litigation was based on facts and events occurring in part in 1971, this establishes that the balance was worthless as of 1971. Again we disagree. As noted above, proof of partial worthlessness must be based on the facts and circumstances occurring in 1971 as known to the taxpayer, and not as subsequently determined by a court. From the facts and circumstances known to Thompson & Green at the end of 1971, it cannot be said that any portion of the $405,704.12 Gregory debt was uncollectable or worthless at that time. Thompson & Green has failed to prove that the Gregory debt was wholly or partially worthless in 1971. Therefore, it has failed to prove that an addition to its bad debt reserve based on the charge-off of all or part of the Gregory debt to its reserve would have been reasonable. Since Thompson & Green has failed its threshold burden of proving its proposed addition to be reasonable, we need not reach the issue as to whether respondent may have abused his statutory discretion. However, citing Calavo, Inc. v. Commissioner,304 F. 2d 650 (9th Cir. 1962), revg. a Memorandum Opinion of this Court, Thompson & Green*753 argues that even if no portion of the Gregory debt was properly charged off to the reserve in 1971, nonetheless respondent, who determined that a reasonable reserve under the Black Motor formula was zero and thus allowed a deduction only for the actual worthless debts properly charged off for the year, ignored the speculative nature of Thompson & Green's lawsuit against USF&G over a debt that comprised nearly 10 percent of Thompson & Green's year-end accounts receivable, and thus abused his discretion. In Calavo, a debtor to whom the taxpayer had made substantial advances had become insolvent within the taxable year in question. Although the debt had not become worthless and the taxpayer had not charged off the debt to its reserve as worthless, it sought to increase its reserve (and thus its allowable deduction for additions to the reserve) to guard against probable loss on that specific debt. In denying the addition, the Government argued that no specific debt is ever taken into account in determining a reasonable reserve unless it becomes worthless during the taxable year in question. In response, the Court of Appeals for the Ninth Circuit stated: It is clear that debts*754 may not be charged off against the reserve until they have become worthless. It does not follow, however, that the circumstances particularly affecting a specific debt must be completely disregarded in determining the reasonableness of additions to reserve. Since the reserve normally is dealing with unknown factors bearing upon unidentifiable accounts, its reasonable extent is ordinarily calculated by resort to past experience with such accounts in the composite.But the fact that experience is the guide in dealing with unknown factors and unidentifiable accounts should not require us to reject the more accurate guidance of known factors bearing upon identifiable accounts when such information is available. The extent of a reasonable reserve should depend upon an adjustment between known circumstances and experience. The difficulty we face is that it is apparent that the commissioner has, in disallowing any addition to reserve, refused to give any consideration whatsoever to the circumstances affecting the [insolvent debtor's] account. His discretion has thus been exercised under a misapprehension as to the considerations upon which it should be based. This, we feel, requires*755 a reconsideration by the commissioner of the question as to what under all of the circumstances would be a reasonable addition to reserve and a re-exercise of his discretion upon this question. Calavo, Inc. v. Commissioner,supra,304 F. 2d at 654, 655 (footnotes and footnote references omitted). It should be noted that rather than finding an abuse of discretion and itself determining a reasonable addition to the reserve because of this specific doubtful debt, or remanding to the Tax Court as the trier of fact to determine a reasonable addition, the Court of Appeals reversed and remanded to the Tax Court: with instructions that its judgment be vacated and that the cause upon the present record be resubmitted to the commissioner for an exercise of his discretion free from his erroneous conception that the circumstances particularly affecting a specific debt must be completely disregarded in determining the reasonableness of additions to reserve. * * * 304 F. 2d at 655. The Court of Appeals left to the Commissioner's discretion the manner in which he should consider the specific bad debt, but its suggested approach is similar to the test*756 of partial worthlessness. See Calavo, Inc. v. Commissioner,supra,304 F. 2d at 655 n. 7. This case comes to us in a slightly different posture than Calavo.Here, Thompson & Green initially charged the Gregory debt to its reserve in 1971 as wholly worthless and accordingly computed its deduction for additions to the reserve under the Black Motor formula. Respondent disallowed the charge-off and redetermined Thompson & Green's addition to its reserve under the Black Motor formula without any allowance for the Gregory debt. We have carefully considered the question of both total worthlessness and partial worthlessness. Since Thompson & Green has failed to show that the Gregory debt was either wholly or partially worthless in 1971, we cannot say that respondent's determination was incorrect, let alone an abuse of discretion. Moreover, respondent does not appear to argue, as he did in Calavo, that a specific debt, not worthless, is completely irrelevant in determining a reasonable reserve. Respondent appears to argue that in view of Thompson & Green's protracted litigation against Gregory and USF&G on this debt, and its ultimate partial success, no addition*757 to the reserve need have been made on account of this claim. We agree. The fact that the respondent's redetermination of a taxpayer's reasonable additions results in a reserve of zero does not perse constitute an abuse of discretion. High Plains Agriculture Credit Corp. v. Commissioner,63 T.C. 118, 129 (1974). At the end of 1971, Thompson & Green's bad debt recoveries exceeded the bad debts charged off (without the Gregory debt) over the six-year period utilized under the Black Motor formula. Thus, a zero bad debt reserve was proper unless the uncertainties of the litigation involving the Gregory debt compelled some consideration of that debt in 1971. Thompson & Green's chances of recovery from USF&G were speculative to some extent, as is the case with most litigation. To show the doubtful nature of its claim against USF&G, Thompson & Green relies mainly upon the various defenses raised by the surety, USF&G, in that litigation. 21 However, as the litigation was ultimately concluded, most of the surety's defenses failed. Thompson & Green argues that its attorneys advised them that its chances of recovery were extremely doubtful, but the record does*758 not support such a finding. Again we do not totally disregard the fact that a judgment for virtually the full amount was obtained against Gregory in 1975. Thompson & Green has simply failed to carry its heavy burden of proving any abuse of discretion in this case. Respondent's redetermination of petitioner Thompson & Green's additions to its bad debt reserve for 1971 is sustained. B. 1976 DeductionIn 1976, Thompson & Green abandoned its use of the Black Motor formula for computing its bad debt reserve and instead sought to compute its reserve through a specific analysis of doubtful*759 accounts. Petitioner's assistant credit manager, Charles Cherry, examined all of Thompson & Green's 1976 year-end accounts receivable that he considered more than 90 days delinquent and identified 16 specific accounts that for various reasons he considered doubtful. On the basis of these 16 specific "doubtful" accounts, Thompson & Green computed its bad debt reserve and thus its deduction for additions to the reserve. In his notice of deficiency, respondent recomputed Thompson & Green's bad debt reserve, and thus its deduction for reasonable additions thereto, using the Black Motor six-year floating average formula and consequently disallowed most of Thompson & Green's claimed deduction. To overcome respondent's determination, Thompson & Green must carry the heavy burden of proving, first, that its proposed addition was reasonable, and, second, that respondent's redetermination was an abuse of his discretion. Thor Power Tool Co. v. Commissioner,supra,439 U.S. at 549; Roth Steel Tube Co. v. Commissioner,supra,620 F. 2d at 1179; Roanoke Vending Exchange, Inc. v. Commissioner,supra,40 T.C. at 741. Thompson & Green*760 has again failed its threshold burden of proving its own proposed addition to the reserve to be reasonable. Thompson & Green first argues that its proposed addition is reasonable and necessary because of what it considered to be a dramatic increase in its accounts receivable. This argument is erroneous. The bad debt reserve and resultant additions thereto computed under the Black Motor method is calculated as a percentage of year-end accounts receivable. The percentage is determined on an historical basis, but the figure to which it is applied, year-end receivables, accurately reflects changes in business volume. Atlantic Discount Co., Inc. v. United States,473 F. 2d 412, 415 (5th Cir. 1973); Valmont Industries, Inc. v. Commissioner,73 T.C. 1059, 1069 (1980). Thompson & Green also argues that its new method of computing its reserve (specific analysis of doubtful accounts) is justified because of the peculiar manner in which it accounts for repossessions of equipment. As noted in the findings of fact, when Thompson & Green in satisfaction of the debt repossesses equipment leased or sold, its practice is to cancel the entire account receivable*761 and to credit that entire amount to the inventory account attributable to the repossessed equipment. Thus, its ultimate recognition of loss on the resale of the repossessed equipment is postponed until such resale. Thompson & Green argues that this justifies a larger reserve since these bad debt losses are not charged off to the reserve and thus not reflected in the Black Motor computation. We believe that Thompson & Green's method of accounting for equipment repossessions may well demonstrate the unreasonableness of its addition. As respondent notes, there is a certain symmetry to the operation of a bad debt reserve: (1) specific debts are charged off as they become worthless; (2) recoveries of debts previously charged off to the reserve are added back into the reserve; and (3) at the year-end there are additions to the reserve to restore it to a reasonable balance for future losses. If Thompson & Green were permitted to compute its reserve and thus its deductions for additions to such reserve on the basis of debts that were not charged to the reserve, a system it refers to as "reserving" the debts, the reserve method would be distorted into something akin to a contingency*762 fund and the same debt would be deducted twice in some instances. Finally, the operation of Thompson & Green's reserve under its new method of computing the reserve balance establishes its unreasonableness. Under this new method, Thompson & Green sought to compute the necessary reserve on the basis of specific doubtful accounts rather than an average of year-end receivables based on historical experience. Thompson & Green's accounting manager, Jerry Brown, testified that "the deduction would have the same net result as if the accounts had been charged off to the reserve." However, it appears that some of these specific debts that Thompson & Green used to compute its addition to its reserve in 1976 were charged off to its reserve in later years, and thus went into computing Thompson & Green's bad debt deduction under section 166(c) for subsequent years. On brief Thompson & Green appears to admit this: "…[A] number of doubtful accounts used to determine the 1976 reserve had subsequently been written off to the reserve as worthless." Thus, by using these specific debts once in computing the reasonable additions to the reserve (e.g., "as if the accounts had been charged off to*763 the reserve") and by then again charging off such accounts to the reserve as they actually became worthless in the future years, Thompson & Green ended up deducting the same bad debt twice. This is plainly impermissible, and points out the fundamental flaw of Thompson & Green's new method. The record establishes that Thompson & Green's new method was unreasonable. Accordingly, we really do not reach the issue as to whether respondent abused his discretion under section 166(c).However, Thompson & Green argues that even if respondent properly redetermined its 1976 bad debt deduction under the Black Motor formula, respondent abused his discretion by not utilizing any of the $405,704.12 Gregory debt in redetermining Thompson & Green's 1976 bad debt reserve, and thus its deduction for a reasonable addition to such reserve. The six years used in making the calculation under the Black Motor formula were, of course, 1971 through 1976. Thompson & Green argues that since the Chancellor entered judgment against the surety in 1975 in an amount of $273,753.84, an amount which was $131,950.28 less than the total Gregory debt, and since Thompson & Green did not appeal the Chancellor's*764 decree, the decree established partial worthlessness to that extent in 1975.Accordingly, Thompson & Green argues that respondent abused his discretion by not allowing this partially worthless debt in recomputing Thompson & Green's deduction for additions to its bad debt reserve under the Black Motor formula. We disagree. First of all, Thompson & Green completely ignores that in 1975, the Chancellor also entered judgment against Gregory for the amount of $403,482.23 for machine rentals and $9,884.29 for parts and services. Moreover, even if we look at just the judgment against USF&G, we are not wholly convinced that the Chancellor's decree against USF&G and in favor of Thompson & Green became final in 1975.From the record, all that we can determine is that the decree was entered sometime in April of 1975. Thereafter USF&G moved for a new trial and rehearing, and the record does not indicate when that motion was acted on or when, if at any time before 1978, the judgment became final as to Thompson & Green. 22 Moreover, even if we accept Thompson & Green's argument that the debt was partially worthless in 1975, Thompson & Green would further have to prove that respondent abused*765 his discretion. Given the inherent uncertainties of any litigation, we cannot find upon this record that respondent abused his discretion by requiring Thompson & Green to wait until the conclusion of its litigation against USF&G to charge off the Gregory debt or to compute its reserve for bad debts based in any manner upon the Gregory debt. Accordingly, we also sustain respondent's redetermination of Thompson & Green's 1976 deduction for an addition to its bad debt reserve. *766 II. Interest from Political Subdivisions of StateSection 103(a)(1) excludes from gross income the interest on obligations of a state or its political subdivisions. 23 The exemption of section 103(a)(1) is not limited to a particular form of obligation, and interest received by a taxpayer on an installment purchase obligation of a governmental entity qualifies. Newlin Machinery Corp. v. Commissioner,28 T.C. 837, 842, 844 (1957); Thompson & Green Machinery Co., Inc. v. United States,327 F. Supp. 1128, 1130 (M.D. Tenn. 1971). 24 See also King v. Commissioner,77 T.C. 1113, 1121 (1981).To qualify for this exemption, the interest must be paid on obligations issued "by or on behalf of any State or local governmental unit by constituted authorities empowered to issue such obligations…." Sec. 1.103-1(b), Income Tax Regs. Respondent determined that the interest Thompson & Green received from its governmental purchasers was not tax exempt because the city or county officials who had contracted with Thompson & Green had not obtained authority to enter into such contracts, and therefore the contracts were not obligations of*767 those governmental units. Generally the taxpayer has the burden of proof to establish that respondent's determination in the statutory notice is incorrect. Rule 142(a). However, in this very narrow circumstance where respondent contends that the contracts were not authorized under state or local law, respondent, not petitioner, bears the burden of proof. As we stated in Newlin Machinery Corp. v. Commissioner,supra,28 T.C. at 843-844: Respondent, to support his contention, asks us to hold that the political subdivisions of Kansas, which bought machinery from petitioner on the installment basis, acted unlawfully under. *768 .. local law…. Respondent has not introduced into evidence anything specifically showing that the political subdivisions did indeed violate the Kansas law. Instead, respondent maintains that once having made his determination, petitioner must prove the legality of the disputed transactions. Respondent is incorrect. While his determination is prima facie correct, the presumption is in petitioner's favor that the transactions which it entered into with the political subdivisions complied with the law.Washington Post Co.,10 B.T.A. 1077; cf. W.H. Weaver,25 T.C. 1067. Furthermore, the position of this Court has consistently been that where contracts are fully executed, and no fraud exists, the rights of the parties which have been established by the contracts will be given effect. Cf. Frances M. Camp,21 B.T.A. 962; J. N. Wheelock,16 T.C. 1435; Joseph S. Finch & Co.,23 B.T.A. 1152. (Emphasis added.) In other words, we will presume that the governmental officials acted legally in contracting with Thompson & Green, and respondent must prove otherwise. To establish that the contracts*769 with Thompson & Green were not legally those of the governmental units, respondent called as witnesses two officials who worked for two of the county highway departments involved. These individuals testified that they had neither sought nor obtained authority from their respective County Quarterly Courts (County Commissioners) to obligate the counties to pay interest to Thompson & Green on the purchase of the equipment under the lease-purchase arrangements involved here. Citing Tenn. Code Ann. § 5-10-501, and § 5-14-108(m), respondent argues that acquisitions of major road building equipment are "capital outlay expenditures" that must be approved by the county legislative body if the purchases are to be made by any form of contract which would bear interest, and that only by resolution of the county legislative body can a county obligate itself for the purchase of equipment when the commitment extends beyond the fiscal year. Since, as these witnesses testified, they did not seek or obtain authorization from their county legislative bodies, respondent concludes that the contracts with Thompson & Green were not legal, and thus were not governmental obligations*770 under section 103. We do not agree. Tenn. Code Ann. § 5-14-108(m) provides in pertinent part: The county purchasing agent is authorized to purchase and contract to purchase materials, supplies, equipment anc contractual services on a fiscal year basis, but no commitment shall be made which extends beyond the end of the current fiscal year for which appropriations have been made by the county legislative body, except such commitments as are authorized by resolution of the county legislative body…. First, respondent has not shown that Tenn. Code Ann. § 5-14-108(m) is applicable to the transactions involved here or that, if it is applicable, that the commitments (with one possible exception) extend beyond the current fiscal year. That section is part of the County Purchasing Law of 1957, which relates to certain competitive bidding procedures and is effective in a particular county only after approval by the county legislative body or other governing body, or by the voters in a special election. Tenn. Code Ann. § 5-14-102 (1980). Our research has failed to disclose whether this legislation*771 was adopted by the governing bodies of Dixon County and Lewis County, the counties that employed respondent's witnesses. Moreover, respondent has presented no evidence to show that this legislation was in effect in Dixon and Lewis Counties during the years in question. Accordingly, even assuming there was a failure to comply with Tenn. Code Ann. § 5-14-108(m), we are not persuaded that that code provision has any applicability here. Also in most instances the minimum rental period under these lease-purchase agreements was less than one year and after the minimum rental period the city or county could return the equipment and pay nothing more. The other local statute respondent relies upon, Tenn. Code Ann. § 5-10-501, provides as follows: (a)(1) The county legislative body or other governing body of a county, acting by resolution, is hereby authorized to issue interest bearing capital outlay notes for capital outlay expenditures, provided that the issuance of such interest bearing capital outlay notes shall first be approved by the state director of local finance. (2) Capital outlay expenditures under the provisions*772 of §§ 5-10-501 through 5-10-509 shall be defined as expenditures for the following purposes: (B) To purchase necessary major road equipment and transportation equipment for schools. (4) The provisions of subdivision (a)(2)(A) and the provisions of subdivision (a)(3) [relating to time periods for capital outlay notes] shall be in addition to and supplemental to all other provisions of other laws of the state of Tennessee, provided that wherever the application of these provisions conflicts with the application of such other provisions, these provisions shall prevail. Tenn. Code Ann. § 5-10-508 provides as follows: No note or promise to repay money issued or made contrary to the provisions of §§ 5-10-501 -- 5-10-509, whether described herein or not, shall constitute a legal obligation of the county, but the same shall be illegal and void. If the holder of such an illegal note shall collect all or part thereof from any county fund or funds, whether the county received the benefit of the proceeds of said note or not, the said payments or partial payments shall be deemed a misappropriation of public funds which shall be recoverable by a suit brought for the use and benefit*773 of the county by any resident or property owner of the county in the circuit or chancery courts and all reasonable expenses, including attorney's fees and court costs, shall be paid from the amount recovered. Thus, it would appear that the provisions of Tenn. Code Ann. §§ 5-10-501 through 5-10-509, provide the solemethod by which a county can obligate itself to pay principal and interest for the purchase of major road equipment, at least where such purchases are made through bonds, notes or other promises to repay money. However, we believe respondent's argument misses the real issue. Respondent's argument that the various governmental contracts with Thompson & Green were not the obligations of the counties involved seems to assume that these contracts were intended as recourse obligations of the various counties.In fact, the evidence appears to the contrary. All the governmental contracts upon which evidence was presented (which documents were stipulated to be representative) only obligated the counties to pay rentals for a minimum period of time. Under Tennessee law, a county operates on a fiscal year beginning July 1 and ending June*774 30 of the following calendar year. Tenn. Code Ann. § 5-12-105 (1980). With one exception, each of the transactions evidenced in the record involved minimum rental periods, usually for one month, for only the current fiscal year. 25 Both of respondent's witnesses testified that they believed they had authority to enter into rental contracts obligating their departments to the extent of current funds (i.e. the current fiscal year's revenues). After the minimum rental period, Thompson & Green's sole remedy for default by the governmental purchasers was to repossess the equipment, and, we thus find Thompson & Green's analogy to a nonrecourse obligation quite apt. Respondent has cited to us no Tennessee law (case or statute), nor have we found any, holding that county highway departments cannot rent equipment or purchase equipment on a nonrecourse basis without approval of the county or the legislative body or without capital outlay expenditure notes or bonds. *775 The crucial question then is whether the governmental purchasers lacked authority to pay the "reverse interest" time payment charges and take title to the equipment. Again respondent has cited no Tennessee case or statute, nor have we found any, holding this beyond the powers of the county highway departments. Moreover, respondent's own witnesses testified that the leasepurchase method of obtaining the road equipment was common practice in Tennessee. The longstanding, wide-spread use of this method of financing suggests that Tennessee authorities did not consider it to be illegal. We conclude that respondent has failed to prove that the interest that Thompson & Green received was other than interest on governmental obligations exempt under section 103. As to the transaction with the Bedford County Highway Department (see footnote 25), the minimum rental period of which extended over two fiscal years, it is possible that authorizing legislation from the county legislative body would be necessary. Unfortunately, respondent did not present any evidence as to this transaction. The documents introduced into evidence as joint exhibits were stipulated as representative documents*776 for the transactions involved in this issue. Respondent presented the testimony of witnesses from only two of these counties. Respondent did not call a witness pr present other evidence regarding the Bedford County Highway Department transaction. Respondent has not argued, and Thompson & Green certainly has not agreed, that the testimony of respondent's two witnesses was representative of all the governmental transactions involved. The fact that the agents for Dixon and Lewis Counties did not seek or obtain legislative authorization to pay interest does not establish that the agent for Bedford County did not do so. Thus, even if authorizing legislation were necessary in the Bedford County transaction, and we are not persuaded that it was, respondent has still failed to prove that such authorizing legislation was not obtained. Since respondent has failed to prove that the governmental entities acted illegally, we find for Thompson & Green and hold that all of the disputed interest qualifies as tax exempt under section 103. III. Travel and Entertainment Expenses/Constructive DividendsThompson & Green claimed deductions for certain travel and entertainment expenses*777 relating to five trips in 1973. Respondent disallowed the claimed deductions on the grounds that they were not ordinary and necessary business expenses under section 162, and further, that Thompson & Green had not adequately substantiated the expenses under section 274(d). 26Section 162(a) allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. The question is essentially factual. Commissioner v. Heininger,320 U.S. 467, 475 (1943); Walliser v. Commissioner,72 T.C. 433, 437 (1979);*778 Henry v. Commissioner,36 T.C. 879, 883 (1961). Thompson & Green must show that the expenses claimed were incurred primarily for business rather than personal or social reasons and that there is a proximate relation between the costs of the trips and Thompson & Green's business of renting and selling heavy construction equipment. Henry v. Commissioner,supra,36 T.C. at 884; Larrabee v. Commissioner,33 T.C. 838, 841 (1960). These same principles apply to corporate taxpayers as well as individual taxpayers. International Trading Co. v. Commissioner,275 F. 2d 578 (7th Cir. 1960), affg. a Memorandum Opinion of this Court; International Artists, Ltd. v. Commissioner,55 T.C. 94 (1970). The taxpayer has the burden of proof, Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), and Thompson & Green has not carried its burden. As to the Kelley tractor trip, Panama trip, Hoover trip, and Mexico trip, the only evidence Thompson & Green produced was the testimony of its principal shareholder and officer, DeWitt C. Thompson, III. Thompson testified in vague, generalized terms regarding*779 the business nature of each trip. No documentary evidence of any sort was presented to corroborate his testimony about these trips. None of the guests testified regarding what, if any, business was transacted during these trips. Not even Thompson suggested that winter vacation and fishing trips to Florida, Panama, Costa Rica, and Mexico were ordinary in Thompson & Green's business, or that such expenses were necessary. See Welch v. Helvering,supra.As to the Grand Cayman Islands trip, there was a sale to CFW of a piece of equipment sometime after the trip. Thompson & Green argues that that sale corroborates the underlying business purpose of the trip. Except for this sale, the evidence of this trip is as inadequate as that of the other trips. We do not believe that the mere fact of a sale, which may well have been coincidental, is sufficient to show that the Grand Cayman Islands trip was of a business nature. This is buttressed by Thompson & Green's failure to call any witness from CFW, or otherwise attempt to prove the business nature of the trip through the records of CFW. We are not convinced that the trip was for anything but recreation. A Thompson & *780 Green employee who was present on that trip candidly admitted on cross-examination that "a fair assessment" of the trip was that they went to Fort Lauderdale to go fishing but the weather was too rough so they flew to the Grand Cayman Islands hoping for better weather, and when the weather was not too good there, they went scuba diving anyway. The cases Thompson & Green cites are inapposite. Both Sanitary Farms Dairy, Inc. v. Commissioner,25 T.C. 463 (1955), and Cleveland-Sandusky Brewing Corp. v. Commissioner,30 T.C. 539 (1958), allowed taxpayers section 162 business expense deductions for somewhat suspect expenditures (a safari and a yacht). However, in both cases, the factual record was replete with concrete, specific and corroborated proof of the nexus between the expenses and the taxpayer's business. Such a factual showing is absent here.Since Thompson & Green has failed to demonstrate that the trip expenses were ordinary and necessary, they are not deductible under section 162, and accordingly, we need not address the substantiation issue under section 274(d). However, we note that the only contemporaneous documentation presented to*781 the Court in regard to these trips was the airplane log. The log failed to establish the essential facts as to the business purpose of the expense and the business relationship to the taxpayer of the persons on the trip, needed to satisfy the "adequate records" requirement of section 274(d).There was no "sufficient evidence" corroborating the vague, generalized testimony of Thompson, the corporation's principal officer and shareholder, so as to satisfy the alternate requirement of section 274(d).As to the constructive dividends issue, Thompson argued that the payments were not constructive dividends to him because they were proper corporate expenditures deductible under section 162. Thompson & Green failed to prove that the payments were ordinary and necessary under section 162. Thompson presented no evidence to show that he derived no benefit from the payments.Cf. Foster v. Commissioner,80 T.C. No. 3, (slip opinion at pp. 326-327) (January 11, 1983); Ashby v. Commissioner,50 T.C. 409, 417-418 (1968). We think it is clear that he personally benefitted from the fishing trips to Panama and Mexico as to which respondent determined he had received*782 a constructive dividend. 27 Accordingly, he has failed to carry his burden of proof on this issue. Welch v. Helvering,supra; Rule 142(a). To reflect the foregoing and the concessions by both parties, Decisions will be entered under Rule 155.Footnotes1. The various settlements, partial settlements, and other concessions by the parties are set out in their stipulation of facts, paragraphs 6-11. The Court notes that the statutory notice, dated June 10, 1975, in docket No. 8307-75 also determined a deficiency of $26,298.87 for the year 1970, and Mr. and Mrs. Thompson did not petition the Court as to that year. The statutory notice, dated June 10, 1975, in docket No. 8314-75 also determined deficiencies of $30,922 for the year 1969 and $34,522.60 for the year 1970, and the corporation did not petition the Court as to those years. The Court assumes that petitioners have conceded the adjustments for those years.↩2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years involved in this case, and all "Rule" references are to the Tax Court Rules of Practice and Procedure.↩3. On audit, the examining agent did not disallow the "parts and service account" write-off of $10,572.03, but disallowed the "machine account" write-off of $405,704.12. The latter amount will be referred to as "the disputed Gregory debt."↩4. Under this formula, the amount reserved for bad debts is determined as a percentage of total year-end accounts receivable, the percentage being a six-year average of net accounts charged off as worthless (charge-offs minus recoveries) divided by a six-year average of year-end accounts receivable. See BlackMotor Co. v. Commissioner,41 B.T.A. 300 (1940), affd. 125 F. 2d 977↩ (6th Cir. 1942).5. WITHOUT GREGORY DEBT↩Balance of A/RBad debtsBad debtsYearat end of yearcharged offrecovered1966$ 1,590,985.27$ 9,073.29$ 44,216.0019671,370,049.5313,495.6946,664.7619682,979,449.8816,151.1430,816.7019693,174,649.5728,318.9221,249.1419703,386,179.268,069.045,626.7819713,616,895.9255,201.872,235.096-yr.Total$16,118,209.43$130,309.95$150,808.476-yr.Average$ 2,686,368.24$ 21,718.33$ 25,134.756. Thompson & Green, charging to the reserve the entire disputed Gregory debt of $405,704.12, calculated its deduction for additions to its reserve as follows: six-year average net bad debts of $64,200.93 ($89,335.68 minus $25,134.75) divided by six-year average year-end accounts receivable of $2,868.368.24, or 2.38987%, times 1971 year-end receivables of $3,616,895.92, to yield a 1971 bad debt reserve of $86,436.58, rounded to $86,437. Petitioner's ComputationReserve at beginning of yearDebts charged off in 1971$460,905.99(less recoveries)In making their respective computations, neither Thompson & Green nor respondent took into account the sum of $2,235.09 in 1971 bad debt recoveries which has been stipulated.*Year-end reserve86,436.58Amortization of 1965 reserve,pursuant to agreement with IRS14,245.001971 addition (deducted on petitioner's return)$561,587.57(rounded off by petitioner to $561,587)Respondent, allowing none of the disputed Gregory debt of $405,704.12 to be charged to the reserve, redetermined Thompson & Green's deduction for additions to its reserve as follows: Zero reserve allowed at the end of 1971. Disallowing the charge-off of the Gregory debt left a negative sum of net bad debts (i.e. recoveries exceeded bad debts charged off), which would have resulted in a zero reserve.Respondent determined that a reasonable reserve at the end of the year was zero and a reasonable addition for the reserve for the year was $69,446.87, as follows: Respondent's Computation↩Reserve at beginning of yearDebts charged to reserve$ 55,201.87(less recoveries)*Amortization of 1965 reserve, pursuantto agreement with IRS14,245.00Year-end reserve1971 addition to reserve (allowed as deductionby respondent)$ 69,446.87Amount of claimed addition (deduction)disallowed$492,140.70(rounded off by respondent to $492,141)7. As stipulated by the parties (with the exceptions noted), Thompson & Green's year-end accounts receivable, bad debts charged to the reserve, and bad debt recoveries for the years 1971-1976 were as follows: Balance of A/RBad debtsBad debtsYearat end of yearcharged offrecovered1971$ 3,616,896 * $ 55,202$ 2,23519723,129,66043,5766,54819733,311,41539,7313,47219742,163,65126,0412,86819754,796,41367,76410,0001976 ** 8,253,000 *** 73,05711,0596-yr.Totals$25,271,035$305,371$36,1826-yr.Averages$ 4,211,839$ 50,895$ 6,030* Does not include any of the disputed Gregory debt. ** This figure was not stipulated by the parties but is derived from the figures stipulated for each year 1971-1975 and from the $25,271,035 figure stipulated as the six-year total of accounts receivable. *** This figure was not stipulated by the parties but is the figure used in the statutory notice and in Thompson & Green's own recomputation under the Black Motor formula. ↩8. For the years 1977, 1978, and 1979, Thompson & Green reported on its Federal tax returns additional income from bad debt recoveries as follows: 1977$10,804.531978149,992.20197923,139.96Of the amount shown for 1978, $132,511.09 represented the collection of the judgment against USF&G upon Thompson & Green's claim of $405,704.12 (the Gregory debt) that it had charged off as worthless in 1971.↩9. Although this piece of equipment was shipped to CFW's job site in February 1973, CFW's purchase order for the item was dated May 8, 1973, and the invoice for the purchase of the equipment was dated May 23, 1973. CFW purchased the 983 Traxcavator for $80,831, less a $25,000 allowance for a trade-in of a model 977 Traxcavator. The record does not establish exactly when this sale was negotiated.↩10. On February 28, 1973 after the fishing trip, Thompson and perhaps his guests attended the Tennessee Road Builders' Convention in Miami, Florida. We cannot determine whether the parties have allowed any amount for the convention in their various settlements, partial settlements, or concessions. On this record we cannot determine that any portion of the expenses claimed for the trip from February 16 through February 28, 1973, is properly deductible by Thompson & Green as expenses relating to that convention.↩11. See also The Branerton Corp. v. Commissioner,T.C. Memo. 1976-365↩.12. While on its return and in its original petition Thompson & Green asserted that the Gregory debt was wholly worthless in 1971, at trial the taxpayer amended its petition to allege partial worthlessness. Consequently, if Thompson & Green can prove partial worthlessness under the test of section 166(a)(2), it will also have proved that an addition calculated under the Black Motor formula using that partially worthless debt would be reasonable. No portion of that debt has been allowed in respondent's calculations. See footnote 6. ↩13. See Drew v. Commissioner,T.C. Memo. 1972-40↩.14. See Griggs v. Peerless Ins. Co.,528 S.W. 2d 182, 187 (Tenn. 1975); Scott v. Travelers Indemnity Co.,384 S.W. 2d 38, 42 (Tenn. 1964); Nicks v. W.C. Baird & Co.,52 S.W. 2d 147 (Tenn. 1932); Wal-Board Supply Co., Inc. v. Daniels,629 S.W. 2d 686, 687↩ (Tenn. App. 1982).15. See also Hubble v. Commissioner,T.C. Memo. 1981-625↩. 16. GUARANTEE:Clark v. Commissioner,85 F. 2d 622, 623-625 (3d Cir. 1936), revg. a Memorandum Opinion of the Board of Tax Appeals dated December 5, 1936; American Trust Co. v. Commissioner,31 F. 2d 47, 49 (9th Cir. 1929), affg. 10 B.T.A. 490 (1928); National Farmers Bank v. Commissioner,6 B.T.A. 138, 141 (1927). COLLATERAL:Stranahan v. Commissioner,42 F. 2d 729, 730-731 (6th Cir. 1930), affg. 14 B.T.A. 1405 (1929), cert. denied 283 U.S. 822 (1931); Kessler Oil & Gas Co. v. Commissioner,41 B.T.A. 31, 37-38 (1940); Bill v. Commissioner,38 B.T.A. 796, 799 (1938). SURETY BOND:Fox v. Commissioner,15 B.T.A. 774, 784-786↩ (1929).17. See Anderegg v. Commissioner,T.C. Memo. 1978-509; Straub Distributing Co., Inc. v. Commissioner,T.C. Memo. 1971-46; Burger v. Commissioner,T.C. Memo. 1964-92↩.18. See footnote 12.The key figure for calculating a reasonable reserve under the Black Motor formula is the taxpayer's net bad debt experience during the six-year period. Because of respondent's disallowance of the charge-off of the Gregory debt, Thompson & Green's net bad debt experience (charge-offs less recoveries) was actually negative (i.e., recoveries exceeded charge-offs for the six-year period), and respondent determined that a reasonable reserve would be zero. If the debt were partially worthless, and thus properly charged to the reserve, under the Black Motor formula that charge-off for partial worthlessness would result in a positive net bad debt experience and thus generate a percentage figure to be multiplied against the year-end receivables which would result in a reasonable reserve greater than zero.Moreover, since the debt would properly have been charged to the reserve to the extent of partial worthlessness, an addition to restore the amount charged off would also be reasonable and proper.↩19. We accord no significance to the manner in which Tompson & Green chose to compensate its attorneys for their services in the suit against Gregory and USF&G (30 percent of the recovery, with a guaranteed minimum of $10,000). Although Thompson & Green argues that this demonstrates worthlessness, the letter from the attorneys memorializing the agreement is dated December 20, 1972. The determination of worthlessness of a debt in a particular year depends upon the facts and circumstances existing at the time, not subsequently. 5 Mertens, Law of Federal Income Taxation, sec. 30.37 (1980 rev. ed.). The record is not adequate to support a finding that this agreement between Thompson & Green and its attorneys was made in 1971, the year in which it asserts partial worthlessness. An agreement made in 1972, as this one appears to have been, would not prove an identifiable portion of a debt to be worthless in 1971.↩20. Respondent argues that the question of the "correct" balance in the parts and service account is a new issue not raised in his notice of deficiency, in the pleadings, or in open court, and thus that the Court should not consider it.If, as seems to be the case, Thompson & Green is attempting to prove that a separate debt from Gregory (the parts and service account) was wholly worthless in 1971, independently of the machine rental accounts that were the subject of the litigation with USF&G, we agree with respondent. However, since the issue of partial worthlessness is properly before the Court, and since there are facts in regard to the parts and service account in the record, we will consider the argument.↩21. USF&G denied liability on several grounds: (1) USF&G contended that Thompson & Green could recover nothing from it on the grounds that the Gregory transactions constituted sales of equipment, subject to Thompson & Green's retained security interest, not "true leases," and thus not subject to USF&G's bond; (2) USF&G contended that Thompson & Green had failed to comply with certain statutory notice requirements, and therefore could not recover from the surety; and (3) USF&G contended that the equipment Gregory leased from Thompson & Green had not been used on contracts it had bonded.↩22. Judgement was against USF&G and Gregory. Under Tennessee Court practice, it is not clear when the judgment became final as to Thompson & Green. While a judgment remains in full force against a party who does not appeal, Tenn. Code Ann. § 27-3-110 (1980) (Tenn. Code. Ann. § 27-3-110 as in effect in 1975, repealed 1981 Tenn. Pub. Acts, ch. 449, § 1(10)), and Thompson & Green did not appeal from the Chancellor's decree, that does not establish that the remaining part of the Gregory debt therefore became worthless in 1975. It is not at all clear how much time Thompson & Green had to appeal, that is to say how much time elapsed before its failure to appeal rendered the judgment in the reduced amount final as to Thompson & Green. Compare Tenn. Code Ann. § 27-3-112 (Tenn. Code Ann. § 27-312 as in effect in 1975, repealed 1981 Tenn. Pub. Acts, ch. 449, § 1(10)), (30 days); Tenn. Code. Ann. § 27-6-104, (Tenn. Code Ann. § 27-604 as in effect in 1975), (one year); and Tenn. Code Ann. § 27-6-105 (Tenn. Code Ann. § 27-605↩ as in effect in 1975), (two years).23. Section 103 provides in pertinent part: (a) General Rule.--Gross income does not include interest on-- (1) the obligations of a State, a Territory, or a possession of the United States, or any political sundivision of any of the foregoing, or of the District of Columbia * * *. ↩24. Thompson & Green relies upon its earlier case on the tax-exempt interest issue, urging that respondent is collaterally estopped by the prior judgment. In view of our decision on the merits, we do not address the collateral estoppel argument.↩25. The transaction with Bedford County Highway Department involved a lease and purchase order dated April 14, 1969, calling for a minimum rental period of 12 months. The transaction with Lewis County Highway Department involved a lease and purchase order dated July 7, 1969 calling for a minimum rental period of 12 months. However, it appears from the record of payment that the parties intended the month of contracting to be one of the 12 months. Consequently, the minimum 12-month lease period was still within the same fiscal year.↩26. Respondent did not determine, nor does he argue now, that the entertainment expenses at issue were not "directly related to… the active conduct of the taxpayer's trade or business," as required by section 274(a)(1)(A). Accordingly, we do not address this question, and limit our inquiry to whether the expenses were ordinary and necessary under section 162, and adequately substantiated under section 274(d). Cf. Walliser v. Commissioner,72 T.C. 433, 438-442↩ (1979). However, the facts of record strongly indicate that the Grand Cayman, Panama, and Mexico trips could not survive a challenge under section 274(a)(1)(A).27. We would also so find as to the Grand Cayman trip, but that trip is no longer in issue in regard to the question of constructive dividends to Mr. Thompson.↩